**PAVLIS et al. v. JACKSON.**

**THE PORTARITISA.**

No. 10004.

Circuit Court of Appeals, Fifth Circuit.

Nov. 10, 1942.

Rehearing Denied Dec. 11, 1942.

F. T. Saussy, of St. Petersburg, Fla., and J. C. Davant, of Clearwater, Fla., for appellants.

Burton G. Henson and Doyle E. Carlton, both of Tampa, Fla., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The sponge boat Portaritisa was libeled by E. Z. Jackson for supplies furnished and money advanced for her use and was claimed by Virginia Pavlis, whose husband Nikitas Pavlis was the boat's master. The special master to whom the case was referred decided there was a maritime lien for the supplies but none for the money, because the boat's crew to whom most of the money was paid as an advance on their future earnings were joint adventurers and had no wage claims and hence no lien. The judge held that the advances of money carried a lien, but that usury was charged which forfeited all interest, and he also disallowed a few items, giving a decree for libelant otherwise. Mrs. Pavlis appeals, and Jackson though making no appeal specifies as error the disallowance of the interest and the items above referred to.

It is contended that Jackson is not in position to attack the rulings made against him because he did not appeal. On an appeal in admiralty the hearing is de novo, and it is our duty to review the whole case and make such decree as ought to have been made. This we will do.

And we deny appellants' contention that the so-called replication to claimants' answer ought to have been stricken and ought now to be ignored. It is argued that it ought in form to have been an amendment of the libel, and it needed allowance by the court, a replication being unknown to admiralty pleading. But the order of the judge refusing to strike it and that it be considered as a denial of new matter set up in the answer, amounts to an allowance and gives it standing as a part of the pleadings. We also hold that although the original libel did exhibit as a single account libelant's dealings with the vessel on three voyages, seeking

recovery for the general balance, that the later pleading which set up that there were three separate voyages, and that what is now claimed is the cash advanced on the first voyage, and a small balance of cash advanced on the last voyage, and the supplies for the last voyage, was effectual thus to modify the claim.

In the evidence there is no dispute that three separate voyages with different crews were made, for each of which money was advanced and supplies furnished substantially as stated in the exhibited accounts; that both money and supplies for the second voyage were settled for, as the accounts show; that at the end of the first voyage the account against the "Diving Boat Portaritisa" for supplies, kept on a separate page, was entered "12/11/39, Paid by check $1086.43", being the full amount, while the page for the "Cash paid out" totalling $1,074.40 has a credit "12/11/39, Paid 63.57 Inst." The accounts for the third voyage show the cash advances are paid, and libelant in his testimony abandoned the claim for any balance, while the supplies $832.66 (corrected to $997.66 by the master) are unpaid. There is no real dispute about any of the items having been advanced or furnished, but it is claimed that usury has been charged as to the money, and that the items of supplies were really disguised loans of money on which usury was charged, and if not, that the supplies were exorbitantly charged for. Contentions of law are that there is no maritime lien for money advanced before a voyage begins, and that Jackson was not a licensed merchant in Florida and could not lawfully sell supplies.

■ On the last point, it appears that some years before 1939 Jackson was adjudged mentally incompetent, and was not relieved of this disability till January 30, 1940. He was, however, carrying on a business of filling station and light groceries in the name of an employee to whom a license was granted. The Florida statute prohibiting the engaging in business without a license, Laws of Florida of 1937, Chapter 18011, was not thereby violated. It appears to be a revenue measure, and the license tax sought to be enforced had been duly paid. Jackson's business accounts are not outlawed.

■ The supplies furnished were in part for the equipment of the vessel, such as fuel, and in part things necessary for the venture in which she was engaged, such as diving suits, food for the crew, and the like. A maritime lien exists for both classes of supplies, 38 C.J., Maritime Liens, § 30; 46 U.S.C.A. § 971. The master of the boat ordered them all, and selected some, and all were received and used by the boat, so far as we can tell. The master testified, and did not point out anything which did not go to the vessel. The fact that many of the articles were not kept by appellee in his store is unimportant. He procured and paid for all, and even when the master took appellee's checks to make payment on delivery the intent was that the articles delivered were sold to appellee and by him resold to the boat. They were so charged on the books, and appellee delivered invoices to the master for them. The agreement was that appellee for this use of his capital or credit was to charge a price which would yield him a profit, the master testifying that ten to fifteen percent was contemplated and usual, appellee testifying that there was no exact agreement and he had added 30% as profit. Inasmuch as there was a lien on the vessel and on the catch, and the voyages were not to be long, we think 30% unreasonable, and will disallow half of it, deducting from the bill for supplies on this account $120.90. No usury is involved, for there was no loan of money, but only a furnishing of goods. We disagree with the holding that the diving suit $67.50 is to be treated as cash advanced. It stands like other articles bought and paid for by appellee and delivered to the boat. It cost him, however, only $50, and $57.50 is all that he should be allowed to charge for it. That amount will be restored to the supply account. The elimination of the items of money sent the Captain while on the voyage as "Expense money" we let stand, it not clearly appearing what was done with the money and the amount sent being disputed and uncertain. We fix the supply account for the third voyage at $762.69.

■ The account for cash is for money paid to the master and by him to crew members for advances to enable them to provide a support for their families during the voyage, or else paid directly to them by order of the master. As a basis for them appellee took during the first voyage notes signed by the master, one for $1,500, and later one for $300, promising to pay interest at 10% No money

was paid on giving the notes, but their consideration was the advances to be made as above stated from time to time, for the ship's use. Advances of a seaman's wages are in general prohibited by 46 U. S.C.A. § 599, but as pointed out in the editorial comment thereunder, the Act of Dec. 21, 1898, 30 Stat. 764, excepts fishing or whaling vessels or yachts. The Act of June 28, 1906, 46 U.S.C.A. § 598, made the prohibition to apply to vessels taking oysters. This indicates that Congress understood oyster boats to be included among fishing boats before the latter Act. We think sponge boats are fishing boats, so that advances may lawfully be made to their crew members.

And we hold these advances are wages, and not mere anticipations of profit on a joint enterprise. This boat, as is customary in the locality, made voyages to fish for sponges, obtaining a crew by promising to pay each member an agreed share in the catch, after paying the expenses of the voyage. The vessel brought the catch in and sold it, deducted from the proceeds the outlay for fuel and supplies, and awarded each seaman his part of the remainder. Many of the seamen were poor and had families to be provided for during the voyage, so it was customary to pay him in advance some money for this use, to be repaid out of his share of the catch. If his share did not equal the advance, the vessel lost the difference because the seaman was usually financially irresponsible. This plan of fishing on shares seems quite common.[1] We think it a form of hiring, the wages being uncertain and contingent, but none the less wages, for which crew members are entitled to a lien against the catch and the vessel. It may be, as is contended, that one advancing money to the vessel to prepay these wages in part would acquire no lien at the time, because the wages are not yet earned; but after a settlement of the catch, as here, in which the advance is used to extinguish pro tanto the wage claim, the matter assumes a different

face for a lien does exist then, and is extinguished by the money previously advanced for this express purpose. We see no reason to deny a derivative lien because several weeks were consumed before the transaction is fully consummated. On the general subject of liens for money advanced a ship, see 38 C.J., Maritime Liens, §§ 66, 67. It seems to be the American maritime doctrine that furnishing money to the master in good faith to obtain repairs or supplies, or to remove liens, in order to forward a voyage of the vessel, raises a lien just as though the things the money was got to pay for had been furnished by the lender. Thomas v. Osborn, 19 How. 22, at page 28, 15 L.Ed. 534; The Grapeshot, 9 Wall. 129, at page 141, 19 L.Ed. 651; Davis v. Child, 7 Fed. Cas. p. 112, No. 3,628. Our conclusion is in line with this doctrine.

As to interest charged on the cash advances we find difficulty. We think the item of credit on the account of December 11, 1939, $63.57 marked "inst" and said by appellee to be interest does not show usury charged. This was not paid by the master, but by one Davant who was settling the proceeds of the catch on the first voyage, and was a check of the latter sent by letter along with a check for $1,086.43. The letter states: "The first check (for $1086.43) is for the amount of supplies furnished by you to the boat Portaritisa, and the other amounts (the $63.57 check) to apply on Pavlis' note at the bank." This sum was not paid and could not be applied as mere interest, and make usury because more than was due as interest, but was paid and must be credited generally. No agreement otherwise appears. But as to $65 which Pavlis, the master, and his interpreter Rouse testify was paid appellee in cash when the first advances were made, as a "commission" on them, both the Special Master and judge have disbelieved appellee's denial, and we follow them. Since ten per cent interest for the duration of the voyage, expected to be three months, but actually nearly four, would be

---

[1] It may be likened to working a crop on shares in the southeast. When a crop is so worked, the landowner furnishes land, and work animal and tools, and furnishes the cropper such supplies as he needs; the cropper furnishes the labor, for which he receives the agreed share in the proceeds of the crop, less the supplies advanced him. The title to the crop is in the landlord. The cropper is a laborer, entitled to a laborer's lien, which he may enforce as such. See Georgia Code §§ 61-501, 61-502, Payne v. Trammell, 29 Ga.App. 475, 115 S.E. 923; Smart v. Hill, 29 Ga.App. 400, 116 S.E. 66; Howard v. Franklin, 32 Ga.App. 737, 124 S.E. 554.

less than half this "commission", such usury is proved as would forfeit all interest, under Comp.Genl.Laws of Florida, §§ 6937, 6939, but not the principal sum under § 6942. The $65 is to be deducted as being forfeited, and the $63.57 as an ordinary credit, leaving the account for advances $945.48 as found by the judge.

The decree is corrected as to principal so as to read $1,708.17 instead of $1,771.57, and is otherwise affirmed. The costs of appeal will be equally divided.

Modified and affirmed.