**CRUSTACEAN TRANSPORTATION CORPORATION as owner of the M/V CRUSTACEA, Appellant,**

v.

**ATALANTA TRADING CORPORATION, Appellee.**

No. 22557.

United States Court of Appeals Fifth Circuit.

Dec. 5, 1966.

Rehearing Denied Jan. 13, 1967.

Raymond J. Burke, Burke & Parsons, New York City, James B. Kemp, Jr., New Orleans, La., Thomas A. Dillon, Jr., New York City, of counsel, for appellant.

Henry L. Newell, Balboa, Canal Zone, for appellee.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

COLEMAN, Circuit Judge.

Respondent, Crustacean, appeals an order of the District Court directing sale of its ship pursuant to statutory lien of libellant, 46 U.S.C.A., §§ 971, 972, 974.[1] We affirm.

---

1. 46 U.S.C.A., § 971—Persons entitled to lien. Any person furnishing repairs, supplies, towage, use of dry dock or marine railway or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C.A. § 972—Persons authorized to procure repairs, supplies, and necessaries.—The following persons shall be

On July 1, 1963, Morgan Hackman, a respondent in the action in the District Court, was the sole owner of the M/V "Crustacea", an undocumented vessel, located at Alameda, California. On that day, he caused a bill of sale to be executed transferring title of the vessel to Crustacean Transportation Corporation a Liberian corporation of which he was sole stockholder. As hereinafter shown, this bill of sale was not recorded until July 15.

Mr. Hackman had a residence on Long Island, New York, but for some years had been engaged in the seafood business in Brazil, where his corporation was known as Lagostas Verdes Mares Ltda. He had been financing his operations by the assistance of Atalanta Trading Corporation. He was in arrears in his commitments to that corporation and "his personal credit had been exhausted".

In the early part of July, 1963, Mr. Hackman went to Atalanta's New York office and told of a plan he had to convert and adapt a tanker which he had purchased in order to carry live lobsters from Brazil to France. He conducted his negotiations with Mr. Leon Rubin, President of Atalanta. Mr. Rubin testified as follows:

"He showed me correspondence and exchange of cables and letters where he had formed a joint venture with two French importers who had agreed to establish letters of credit paying against shipping documents of these lobsters and agreed to share with Mr. Hackman in the profit realized upon arrival of these and sale of these in France. He, Hackman, told me after purchasing the vessel and initiating certain work he found himself short of funds to convert the vessel and make it seaworthy and suitable for the operation and asked me if my company would be willing to advance funds for

this purpose. I told Mr. Hackman, from past dealings I have had with him he was in arrears on his commitments to us and therefore his personal credit had been exhausted. Then he told me this operation appeared to be so lucrative that it would bring him out of his financial difficulties and enable him to get back on his feet. Our company has had considerable experience with ships and owned several ships and after consulting our attorneys in New York, I agreed under certain conditions, which I set forth in the memorandum, to advance the moneys to Mr. Hackman's ship because it was apparently sufficient equity, there was sufcient equity in the ship for the amount of money I was going to advance and also because Mr. Hackman agreed to assign to our company the proceeds of the letters of credit in repayment of the advance."

There was further testimony as follows:

"Q. Mr. Rubin, who did Mr. Hackman say owned the Crustacea at the time the document was signed?

A. Mr. Hackman personally.

Q. Did he assure you he owned the Crustacea?

A. Oh, yes.

Q. Did you have any further dealing with Mr. Hackman subsequent to these two memorandum here, on this Crustacea?

A. Yes, when the boat sailed, it had some defects and had to pull into port twice before arriving in Panama and we received cables from the Master of the ship saying they need funds in order to repair and proceed and we notified Mr. Hackman that we had the messages and we sent the money to the Master, once to San Diego and once in a Latin American port, either Mexico

---

presumed to have authority from the owner to procure repairs, supplies * * * and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted.

46 U.S.C.A. § 974.—Waiver of right to lien.—Nothing in this section shall be construed to prevent the furnisher of repairs, supplies * * * or other necessaries, or the mortgagee, from waiving his right to a lien * * *

or Costa Rica. In both instances, we sent money so they could repair the ship and proceed on their voyage."

At another point, Mr. Hackman testified as follows:

"* * * but when he was in default and didn't meet his commitments and we said no further advances, then when he came in about money for the ship, I wanted to specifically specify that the money was given to complete the ship, convert it and make it seaworthy for the voyage, and I sent one of my associates, Mr. Noegelber, to talk to the contractors, and verify the extent of the money needed, the amount really necessary for this conversion."

In response to questions as to why Atalanta took no mortgage on the vessel, Mr. Rubin stated:

"On the advice that we had from counsel, that the supplying of materials to the ship in the United States is all you need; you do not need to take a mortgage because the moneys advanced have precedence over mortgages".

Hackman did not appear in Court and did not contradict any of this testimony by deposition or otherwise.

On July 9, 1963, Atalanta formally agreed to advance money to Hackman, sole shareholder of the respondent, owner of the vessel. The advances, as evidenced by the written memorandum in the record, were to enable him "to complete the payment for alterations, insurance, and other miscellaneous expenses and to cover the costs of moving the shipment [of live lobsters] promptly to Brazil and from there to France * * *."

Hackman had obtained letters of credit from two of his French clients to purchase lobsters shipped from Brazil to France. Hackman agreed to assign these letters of credit to Atalanta. The letters guaranteed payment of 17½ cents per pound for live lobsters delivered at Brest. Upon payment, Atalanta was to credit amounts against Hackman's account sufficient to cover the advances made. The agreement further provided that Atalanta was entitled to a 6% interest charge

on funds advanced, a 5% commission on the first $17,500 advanced, and a further 5% commission on all profits received by Hackman from the venture.

Atalanta advanced over $20,000 to Hackman pursuant to the agreement, as amended July 17, 1963. The advances were made through the Bank of California in San Francisco which credited the account of Hackman. Atalanta billed Hackman's Brazilian corporation, Langostas Verdes Mares, Ltda., mailing monthly statements on an account entitled "Lobster Account". At pre-trial the parties stipulated that $22,399.15 of the balance of $26,849.15 shown on Atalanta's statement on the lobster venture account were advanced for ship repairs and provisions.

On July 15, 1963, the July 1 bill of sale transferring title of the M/V "Crustacea" was recorded and the ship was documented under the Liberian flag in the name of Crustacean Transportation Corporation.

Shortly after monies had been advanced, the vessel sailed from San Francisco. Around the beginning of August, 1963, it arrived at the Canal Zone and was attached thereon January 8, 1964, after the lobster venture had failed.

After bringing its libel in rem, Atalanta paid the maritime lien of Cia de Comercio Libra de Colon, an intervenor in the action, in the amount of $4,757.50. Subrogating to this lien, Atalanta increased its libel from $22,399.15 to $27,-156.65, the amount for which final judgment was rendered. There appears to be no controversy about the validity of the $4,757.50 libel of Cia de Comercio Libra de Colon to which Atalanta subrogated, so that only the lien arising from the $22,399.15 advanced by Atalanta to Hackman is involved in this appeal.

■ Appellant asserts that advancing money to Hackman for the prospective purchase of "repairs, supplies, and other necessaries" cannot create a maritime lien. Conceding that one who advances money to discharge maritime liens inherits the rank of the lien discharged (Black

and Gilmore, The Law on Admiralty, p. 519), nevertheless, appellant points out that here money was advanced prior to the existence of any lien. Therefore, says appellant, Atalanta obtained no lien to which it could subrogate upon payment for repairs, supplies, etc. by Hackman, because Hackman, as the vessel's owner, could not create a lien upon the vessel.

We disagree. We think this Court settled the question in Pavlis v. Jackson, 131 F.2d 362 (1942), cert. den. 318 U.S. 769, 63 S.Ct. 761, 87 L.Ed. 1140. In *Pavlis*, monies were advanced prior to the voyage to pay the wages of the crew aboard a fishing vessel. It was there held that furnishing money to the master in good faith to obtain repairs or supplies in order to forward a voyage of the vessel raises a lien just as though the things money was secured to pay for had been furnished by the lender.

Hackman was a managing owner or an authorized person similarly situated with a ship's master under the United States Maritime Lien statutes. Atalanta's advances to him, used to pay for items that would otherwise raise a maritime lien, derivatively raise a lien in favor of Atalanta.

■ Appellant asserts that Atalanta's advances to Hackman were part of a joint venture from which no maritime lien could arise, in other words, that Atalanta had waived its lien by solely relying on the credit of Hackman. The evidence adduced in the District Court and credited by it was overwhelmingly to the contrary. The Court found that there was no waiver. This finding cannot be disturbed unless clearly erroneous, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Trinidad Corporation v. Indian Towing Company, 5 Cir., 1961, 293 F.2d 107. Furnishing or supplying a vessel is presumptively done on the credit of the ship, and one attacking presumption has the affirmative burden of showing that the personal credit of the owner was solely relied on, Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Company, 5 Cir., 1958, 261 F.2d 861, 867. To sustain its

burden, respondent adduced evidence that Atalanta had obtained a security interest other than a lien on the vessel by requiring Hackman to assign his letters of credit. Respondent further attempted to show that Atalanta, through its agreement with Hackman, intended to rely on the monies and profits received from the lobster venture for repayment of its advances.

The District Court rules:

"That despite the commercial transactions between Morgan Hackman and Atalanta Trading Corporation, the evidence is that the advances were made on the credit of the vessel."

"That the burden of proof that the maritime lien in favor of libellant did not exist was not overcome by the evidence adduced by respondents."

■ The agreement and the testimony reveal that Atalanta was to be paid from the proceeds received for delivery of the lobsters and that it was to take a 5% service charge on the principal loaned to Hackman and on Hackman's profit. Further, the President of Atalanta testified that at the time of the discussion of the lobster venture, Hackman's personal credit with Atalanta had been exhausted because his past commitments were in arrears. This supports the conclusion that Atalanta was taking every precaution not to rely on the personal credit of Hackman by imposing the conditions of the agreement on Hackman.

■ The law is " * * * clear that the subsequent taking by the lienor of collateral security for his claim—for example, an assignment of freights—or of acceptances or notes from the owner or the working out with the owner of schedules of payment or the like will not be stigmatized as acts of waiver. On the contrary, such attempts to secure or satisfy the debt are more apt to be looked on as satisfactory evidence of the lienor's diligence and thus protect him against the charge of laches." Black and Gilmore, supra at 640. See Point Landing v. Alabama Dry Dock, supra, 261 F.2d at 867 (taking of additional security does

not show exclusive reliance upon credit of owner) and Pavlis v. Jackson, supra, 131 F.2d at 365 (repayment of advances from proceeds earned from the voyage does not constitute waiver).

As authority for its contention that the District Court should have found the existence of a joint venture respondent-appellant cites The Odysseus III, 77 F.Supp. 297, 299 (S.D.Fla.1948), in which the trial judge concluded that part of the monies advanced were pursuant to a contractual joint venture. But in the case at bar, the District Court found that the appellant had not met its burden of proving a joint venture and such finding is certainly supported by substantial evidence.

The question is one to be resolved by the trier of facts in each case, bearing in mind the presumption in favor of the lien. As discussed in The Minnie and Emma, 21 F.2d 991, 992 (D.Md. 1922):

> " * * * There appears to be a direct conflict in the evidence as to whether libelant really relied upon the credit of claimant, in view of their previous dealings. Libelant stated that he relied upon the credit of the vessel. The master testified that nothing was said on this point. It therefore seems proper to let the presumption rule, and allow the lien."

Finally, appellant claims that part of advances made by Atalanta went to the payment of claims other than those that would give rise to maritime liens, i. e. insurance and miscellaneous items such as telegrams and bank charges.

This contention was not raised at the trial. No objection to any dollar amount of Atalanta's claim appears anywhere in the record. On the contrary, at pre-trial conference, the parties specifically stipulated " * * * that the vessel was repaired and provisions furnished in the amount of $22,399.15, so that there is no question as to the amount involved."

The libel was only brought for $22,399.15, although the outstanding balance reflected on Atalanta's statement of account to Hackman's Brazilian corporation c/o Lobster Account was $26,849.15. The amounts enumerated by the appellant in its brief as items which would not give rise to a lien total $4,399.15. When this amount is subtracted from the outstanding balance of Hackman's account, the total is $22,450.00, or only $50.85 more than the amount sought in the libel and stipulated between the parties to be the correct amount in controversy. It would thus appear that Atalanta has already deducted most, if not all, the non-lien items from Hackman's balance, and appellant is precluded from raising this issue after stipulating otherwise.

The Judgment of the District Court is

Affirmed.