SOUTH CAROLINA STATE PORTS AUTHORITY, Plaintiff,

v.

M/V TYSON LYKES, ex Delaware Bay, her engines, tackle, apparel, furniture, etc., in rem, Defendant,

and

First American Bulk Carrier Corporation, Claimant.

SOUTH CAROLINA STATE PORTS AUTHORITY, Plaintiff,

v.

M/V TILLIE LYKES, ex Chesapeake Bay, her engines, tackle, apparel, furniture, etc., in rem, Defendant,

and

First American Bulk Carrier Corporation, Claimant.

Nos. 2:90–3026–18, 2:90–3027–18.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 13, 1993.

Philip Lawrence, Charleston, SC, for plaintiff.

Gordon Schreck, Charleston, SC, Christopher Dillon, New York City, for defendant.

## ORDER

NORTON, District Judge.

### I. BACKGROUND

In these consolidated Fed.R.Civ.P. 9(h) admiralty actions, the plaintiff South Carolina State Ports Authority (hereinafter "SPA") sued the container vessels M/V TYSON LYKES and the M/V TILLIE LYKES, *in rem*, seeking to assert and foreclose purported maritime liens against those vessels for "dockage, wharfage, usage, equipment, rental, labor, container services, and other terminal services" furnished by the SPA pursuant to its Terminal Tariff. The SPA alleges in its complaint that these services were "necessaries" and were "furnished at the instance and request of the owner and operator of said vessels." The SPA further alleges that these services were maritime in nature, so as to support "an admiralty and maritime claim" within the admiralty jurisdiction of this court.

The claimant and owner of the vessels, First American Bulk Carrier Corporation (hereinafter "FABC") entered its claim to the defendant vessels and appeared and answered on their behalf, after posting security in the form of a letter of undertaking in favor of the SPA, so as to avoid the vessels' arrest. In its answers to the complaints, FABC denied that certain of the services provided by the SPA were maritime in nature or had been furnished upon the credit of the vessels, and affirmatively alleged that plaintiff's claims, in any event, were barred by the doctrines of laches, waiver, estoppel and/or *lis alibi pendens*.

The case was tried before this tribunal, sitting without a jury, on June 17, 1993.

Having considered the testimony and the exhibits admitted at trial, and the pre-trial briefs and proposed orders submitted to the court by the parties, this court now makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

A. The M/V TYSON LYKES and the M/V TILLIE LYKES are American-flag container vessels designed to transport cargo in standard metal ocean containers by water from one port to another. During October–December, 1989, the time frame relevant to this case, those vessels were being operated by Topgallant Lines, Inc., an intermodal carrier, under the names DELAWARE BAY and CHESAPEAKE BAY. The vessels' owner, FABC, had chartered the vessels in April of 1987 to Topgallant Group, Inc., which in turn had, with FABC's consent, assigned the vessel charters to Topgallant Lines, Inc. in June, 1989. For ease of reference, Topgallant Group and Topgallant Lines will be referred to herein as "Topgallant."

B. The SPA, an agency of the State of South Carolina, owns, operates and maintains certain ocean marine terminal and port facilities at the Port of Charleston, including facilities and equipment for the handling of container vessels and their cargoes. In fact, the SPA has the only terminals in the Port of Charleston equipped with the specialized cranes and equipment required for handling ocean containers. The SPA also has storage facilities located at its marine terminals where containers can be marshalled, stored and serviced while awaiting loading for export shipment, or pending ultimate delivery to a consignee after discharge.

C. The SPA provided port and terminal services to the defendant vessels under the State Ports Authority Tariff (hereinafter "Tariff").

D. Topgallant appointed Southeastern Maritime Company (hereinafter "SEMCO") as its steamship agent in Charleston, South Carolina. Topgallant had no offices in Charleston. SEMCO guaranteed all SPA charges incurred by Topgallant in connection with its operations at Charleston. The par-

ties dispute whether, by extracting this financial guarantee, the SPA forfeited its right to rely on the credit of the vessels. SPA's position is that this guarantee was "additional security" and not a requirement for Topgallant to call on SPA. SPA argues that it never gave up its right to use the vessels, themselves, as security. Defendants argue that the execution of the guarantee acted as a waiver of SPA's right to use the vessels as security.

E. In connection with the calls of the CHESAPEAKE BAY and DELAWARE BAY at the Port of Charleston, Topgallant also engaged the services of a local stevedore contractor, Allsouth Stevedoring Company (hereinafter "Allsouth"), to load and discharge the cargo from its vessels. Allsouth was an affiliated company of SEMCO, with its principle office in Savannah, but with a local office in Charleston. William R. McPherson was the District Manager and Stevedoring Superintendent for Allsouth in Charleston, and was responsible for Allsouth's stevedoring activities, including the stevedore services provided to Topgallant to load and discharge the CHESAPEAKE BAY and DELAWARE BAY during those vessels' calls at Charleston. In the case at bar, Allsouth contracted with Topgallant to handle the loading and discharging of containerized cargo carried by the CHESAPEAKE BAY and DELAWARE BAY on a flat rate per-container or "pick-rate" basis. This rate included the rental of container cranes and handling equipment necessary to effect the loading and discharge of the containers. McPherson testified that this flat rate included the "stevedore usage" charge assessed by the SPA to Allsouth for the use of SPA facilities for stevedoring purposes. McPherson testified that it was customary, at the Port of Charleston, for stevedores to rent the container cranes and container handling equipment of the SPA to load and discharge container vessels, since the stevedores did not own their own container cranes and handling equipment.

F. The SPA sent its invoices for container crane rental, container handling equipment rental and stevedore usage to Allsouth's Charleston office, to the attention of

Mr. McPherson. Each invoice also noted the vessel's name, indicating for which vessel the charges were associated. McPherson testified that he received the invoices, in his capacity as District Manager and Stevedoring Superintendent for Allsouth, approved the invoices for payment, and forwarded them to his company's Savannah office for processing and billing to Topgallant.

G. SPA also directed some of its invoices to SEMCO for container handler services. SEMCO never received any invoices for stevedore usage or crane rental.

H. The CHESAPEAKE BAY and DELAWARE BAY called regularly at Charleston beginning in 1987 and continuing through 1989. In 1989, Topgallant began experiencing severe cash-flow problems and fell behind on its payments to the SPA by more than the 30 days allowed by the credit arrangement. Tariff, Item 55 (30 day credit arrangement). The testimony at trial, however, showed that the SPA service business was actually, in reality, a "60 day business." William Lawrence, the Chief Financial Officer of the SPA, testified that the SPA usually takes no action on a delinquent "30 day account," since the SPA is, in reality, involved in a "60 day industry."

I. Notwithstanding Topgallant's payment delinquencies, the SPA continued to extend credit to Topgallant and to permit the CHESAPEAKE BAY and DELAWARE BAY to use its facilities without requiring advance payment. Mr. Lawrence testified that Topgallant was a minimum of 90 days in arrears as of December 1989. Mr. Lawrence further testified that 90 days was not "the end of the world" since the SPA is involved in a "60 day industry."

J. On December 13, 1989, Topgallant filed for protection under the United States Bankruptcy Act in the United States Bankruptcy Court for the Southern District of Georgia, Savannah Division. Shortly thereafter, both vessels were arrested in Bremerhaven, Germany in proceedings instituted by creditors of Topgallant claiming maritime liens.

K. The SPA did not pursue its lien claims against the vessels in those proceedings, but rather notified SEMCO, by letter dated December 22, 1989, that it was calling in SEMCO's guarantee to respond to the outstanding accounts, which at that time totalled approximately $490,000.00.

L. In response to the SPA's demands under the guarantee agreement, SEMCO negotiated an agreement with the SPA for the payment of the outstanding balance due by SEMCO, on behalf of Topgallant, in twelve (12) monthly installments of $42,788.63, principal and interest, commencing in January of 1990 and continuing through December of 1990. Commencing with a first invoice dated January 11, 1990, the SPA began submitting monthly invoices to SEMCO under this installment payment agreement, and SEMCO continued to make those payments through May or June of 1990.[1]

M. At the time Topgallant filed for bankruptcy, Allsouth owed the SPA a total of $163,408.53. To collect this outstanding balance, the SPA entered into an installment payment agreement with Allsouth, similar to the arrangement with SEMCO, whereby Allsouth agreed to pay the entire balance in twelve (12) equal and successive monthly installments of $14,309.27 each, commencing in January of 1990 and continuing through December of 1990. Allsouth continued to make those installment payments until May or June of 1990, when payments of principal ceased. Allsouth and SEMCO continued to make interest payments for sometime thereafter.[2]

N. It was not until October of 1990, when the CHESAPEAKE BAY and DELAWARE

---

**1.** Mike Alvarez, an employee of SEMCO for ten years, testified about the payment arrangement between SEMCO and the SPA. Mr. Alvarez testified that SEMCO had agreed to pay the SPA all monies collected from Topgallant. (Both SEMCO and Allsouth paid the SPA for services provided the defendant vessels and collected that money from Topgallant.) Once the Topgallant collections' fund was exhausted, SEMCO ceased

its payments to the SPA. SEMCO did continue to pay interest out of SEMCO funds after the Topgallant money was exhausted. *See supra* Statement of Facts, subsection M.

**2.** William Lawrence testified that the interest payments were made through March of 1992.

BAY, having been chartered to Lykes Brothers Steamship Company and having been renamed the TYSON LYKES and TILLIE LYKES, began calling again at the Port of Charleston, that the SPA asserted its lien claims against the vessels.

O. The SPA monitored the vessels' positions for potential arrest for the SPA's maritime liens while the vessels were arrested in Europe.

P. FABC provided the SPA with a letter of undertaking on October 3, 1990, to substitute for the vessels so that the vessels would not be arrested in Charleston.

Q. Before the return of the vessels to Charleston under the Lykes name, FABC sent a letter dated September 10, 1990 to the SPA, entitled "NOTICE OF PROHIBITION AND LACK OF AUTHORITY OF LYKES BROS. STEAMSHIP CO., INC. TO INCUR MARITIME LIENS ON THESE TWO VESSELS." FABC never had sent such a notice concerning these vessels while the vessels were under the management and charter of Topgallant.

R. The charter party between Topgallant and FABC did contain a prohibition of lien clause. The evidence at trial established that the SPA was unaware of this clause through its entire involvement with Topgallant. The evidence showed that SPA personnel had no contact with the vessels' officers or crew and did not board the vessels. The SPA was not a party to the charter party agreement, nor was a copy of that agreement sent to the SPA. According to the deposition testimony of Captain Dean F. Nelson, a master serving on the two vessels at various times, a copy of this clause was posted in the master's office, but he admitted that while the ships were operated by Topgallant, neither he nor anyone in his command had ever spoken with the SPA nor had any communications with the SPA. Nelson Deposition, p. 28 & 34–35.

S. The charges for which the SPA is seeking recovery from the defendant vessels include the following items of services, as described in the SPA invoices introduced at trial: wharfage, dockage, harbor master fees, stevedore usage, crane rental, equipment rental, container labor, break/bulk labor and container/chassis services.

T. Dockage is defined as the charge assessed against a vessels for use of dock space. Tariff, Item 185. The dockage charges against the DELAWARE BAY totalled $16,087.05, and those against the CHESAPEAKE BAY were $11,172.00, for total dockage charges of $27,259.05.

U. Wharfage is a charge assessed against the vessel for using the wharfs for loading and discharging cargo. Tariff, Item 185. The SPA asserts outstanding wharfage charges against the CHESAPEAKE BAY in the amount of $40,948.35, and against the DELAWARE BAY in the amount of $40,-160.49, for total wharfage charges of $81,-108.84.

V. Harbor master fees are described as those assessed against the vessels for coordinating vessel berths and assigning dock space when the vessels arrive. $100.00 in harbor master fees are claimed against the DELAWARE BAY and $50.00 against the CHESAPEAKE BAY.

W. Container crane rental is charged to the stevedore for the rental of the SPA's container cranes in actually loading and discharging containers to and from the vessels at dockside. Tariff, Items 155 & 210. Container crane rental used in connection with the loading and discharge of the CHESAPEAKE BAY was $22,174.64, and similar charges for the DELAWARE BAY totalled $34,035.00, for total crane rental charges of $56,209.64.

X. Container handling equipment charges are assessed for the use of field container handling equipment in moving the containers either from a point of rest in storage at the SPA terminal to the vessel at dockside, or from the vessel at dockside to a point of rest in storage. Tariff, Items 155 & 210. Container handling equipment rental charges assessed to the CHESAPEAKE BAY totalled $14,997.00, and those charged to the DELAWARE BAY were $13,692.00, for a total of $28,689.00 in container equipment rental charges.

Y. Stevedore usage charges were described as the charge assessed by the SPA to

a stevedore for the stevedore's use of its facilities for providing stevedoring services to its customers. Tariff, Item 230. These charges are designed to defray the wear and tear, and expense of maintenance and upkeep of the SPA's facilities. A total of $5,331.81 was charged by the SPA against the CHESAPEAKE BAY, and a total of $5,220.83 against the DELAWARE BAY, for a total of $10,552.64 in stevedore usage charges.

Z. Container labor and break/bulk labor is defined as labor furnished to assist in checking cargo discharged and landed from the vessel. Tariff, Item 35. The SPA asserts labor charges against the DELAWARE BAY of $4,650.25, and $5,613.62 against the CHESAPEAKE BAY, for a total of container and break-bulk labor charges of $10,263.87.

AA. The container/chassis services are defined as those services related to the handling of containers at the SPA terminal prior to moving them to the vessel for loading, or after discharging the containers and placing them at a point of rest on the terminal. Tariff, Item 215 ("vesselized services" description). These charges, referred to by the parties in this case as "vesselized container services," were billed by the SPA to SEMCO and Topgallant, at SEMCO's Charleston office, to the attention of the Manager of SEMCO's local office, Mr. Frank Schachte. The SPA claims $66,762.09 in vesselized container services against the DELAWARE BAY, and $60,555.20 against the CHESAPEAKE BAY, for a total of $127,317.29.

BB. Container/chassis per diem charges are defined as the daily storage charge assessed by the SPA for storing containers at its facility before or after discharge from a vessel. If containers are refrigerated, and require a power source to maintain refrigerated conditions, the SPA assesses a fee for electrical power outlet usage. Neither the per diem storage charges, nor the electrical service charges are allocated to any particular vessel, and are therefore referred to by the parties as "non-vesselized" services.

There are no non-vesselized service charges included in the SPA's claim.

CC. The services the SPA requests as liens against the two vessels total as follows:

Tyson Lykes (DELAWARE BAY) $180,707.71

Tillie Lykes (CHESAPEAKE BAY) $160,842.62

## III. CONCLUSIONS OF LAW

### A. The Federal Maritime Lien Act

The SPA claim of maritime liens for terminal services is based on the Federal Maritime Lien Act, which states:

Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action *in rem* to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a). The SPA argues that its entire claim of maritime liens for terminal services falls under this section of the Federal Maritime Lien Act and that it should therefore be fully compensated for its claim.[3] The defendants' analysis of this case differs slightly—the defendants question the jurisdiction of this court over certain of the SPA's claims; the defendants' question the authority of the parties requesting certain services where the services are agreed to be "necessaries;" and the defendants question the SPA's right to recover on those items that are clearly "necessaries" due to the doctrines of waiver and/or laches. Specifically, the defendants' positions are as follows:

First, the defendants argue that the container/chassis service charges were not directly related to the loading or discharging of cargo to and from the vessels and therefore were not necessaries furnished for the benefit of the vessels so as to qualify as maritime liens. This argument goes to the subject matter jurisdiction of this court over the SPA's claims.

Second, the defendants agree that the charges asserted by the SPA for dockage,

---

**3.** The SPA views the critical issue in this case as being whether the services are in fact "necessaries." Believing that all the services at issue are "necessaries" and that the "necessaries"

were ordered by the owner or a person authorized by the owner, the SPA's inquiry ends and the SPA argues that it is entitled to recover all requested charges.

wharfage, harbor master fees and labor do constitute "necessaries" which were furnished to the vessels on the order of the vessels' masters or someone authorized by them to request those services. The defendants, however, argue that these otherwise lienable charges are not recoverable by the SPA in this case because of the legal doctrines of waiver and/or laches.

Third, the defendants argue that the container crane and container equipment handling rental charges and the stevedore usage charges, though probably necessary to the loading and discharging of the cargo from the vessels, are not recoverable by the SPA, since they were not "furnished" by the SPA to the vessels on the orders of the master or someone authorized to incur liens on the vessels.

The merits of the parties' arguments are addressed below.

## B. Maritime Jurisdiction

■ This court agrees with defendants that it must first determine whether it has jurisdiction over the claims asserted by the plaintiff in order to provide the relief prayed for.

> The [plaintiff] incorrectly focuses on the phrase 'necessaries furnished to vessel' and directs this Court's attention to a long line of cases ... addressing the parameters of this phrase. The [plaintiff's] attention however is premature, because before it can hope to establish a maritime lien under the [Federal Maritime Lien Act] it must first show that the subject matter of the contract at issue falls within the court's admiralty jurisdiction.

*Metropolitan Dade County v. M/V WITRORO,* 1990 A.M.C. 1742, 1990 WL 175110 (S.D.Fla.1990). This court can only enforce maritime liens if the court has admiralty jurisdiction. The determination of admiralty jurisdiction is dependent upon the maritime nature of the contract. *See, e.g., E.S. Binnings, Inc. v. M/V SAUDI RIYADH,* 815 F.2d 660, 666 (11th Cir.1987).

■ In considering the issue of admiralty jurisdiction, the court must be guided by the fundamental premise that maritime liens are to be narrowly and strictly construed. Indeed, the Fourth Circuit has recently noted that "the primary impetus for recognition of the lien was concern for the ship and its needs, not the needs of suppliers or even the ship's owners." *Redcliffe Americas Ltd. v. M/V TYSON LYKES,* 996 F.2d 47, 49 (4th Cir.1993).[4] In that case, involving a claim by another vendor of Topgallant arising out of the same bankruptcy, the Fourth Circuit refused to grant lien status to a claim for container lease charges where the containers were leased and furnished to Topgallant for use in its sole discretion in its ocean container transport operation.

■ In the case at bar, the SPA alleges that all of the services for which a claim is made were maritime in nature and therefore constitute maritime liens for which the maritime jurisdiction of this court can be invoked. In order to constitute a maritime lien, however, the contract or occurrence out of which the dispute arises must itself be maritime, and this depends upon the subject matter of the contract or occurrence. In this regard, it is well established that contracts involving cargo are maritime only to the extent that they are "directly related to loading or unloading the vessel." *Bermuda Exp., N.V. v. M/V LITSA (Ex. LAURIE U),* 872 F.2d 554,

---

**4.** The Fourth Circuit further stated:

> The maritime lien 'had its origin in desire to protect the ship....'
>
> \* \* \* \* \* \*
>
> 'Since [a ship] is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant—that she should be able to obtain upon her own account needed repairs and supplies.... Because the ship's need was the source of the maritime lien it could arise only if the repairs

> or supplies were necessary; if the pledge of her credit was necessary to the obtaining of them; if they were actually obtained; and if they were furnished upon her credit.'
>
> These general principles of the law of maritime liens were undisturbed by passage of the [Federal Maritime Lien Act] in 1910. In particular, as is clear from the Court's decision in *Piedmont* [ *& George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920) ], the Act did not expand the traditionally limited availability of the maritime lien.

563–64 (3d Cir.1989); *Metropolitan Dade County*, 1990 A.M.C. 1742. It appears that certain of the services for which the SPA is claiming liens are maritime in nature, while others are not. Wharfage and dockage have consistently been recognized, by the courts as being "necessary" to the operation of a vessel and therefore maritime in nature and capable of lien status. Likewise, the harbor master fee charges and labor charges appear to be maritime in nature and thus capable of supporting a lien.[5]

■ Certain of the charges asserted by the SPA, however, do not qualify as services of a maritime nature which would support maritime lien treatment. These non-maritime charges are those asserted by the SPA for the container/chassis services. These charges are unrelated to the direct loading or discharging of the vessels. *See Bermuda Exp., N.V.*, 872 F.2d at 563–64 ("To the extent [the chassis component of the plaintiff's claim] ... represent[s] charges for movement of chassis for purposes not directly related to loading or unloading the vessel, they are not necessaries giving rise to maritime liens.").[6]

Of particular significance on the issue of the maritime nature of the so-called "vesselized"[7] container services was the testimony of defendants' expert witness, John J. O'Don-

nell.[8] It was Mr. O'Donnell's opinion that these "vesselized" container services were not directly related to or necessary for the loading, discharge or operation of the vessels so as to be lienable charges against the vessel.[9]

This court therefore concludes that it lacks maritime jurisdiction over that portion of plaintiff's claim seeking recovery for these non-maritime services, and dismisses the same for lack of subject matter jurisdiction. The claims dismissed are those seeking recovery for container/chassis services. This court finds that these services were not related to the loading or discharging of cargo to and from the vessels and therefore were not "necessaries" furnished for the benefit of the vessels so as to qualify as maritime liens.

## C. What Constitutes Necessaries

### 1. Necessaries Provided on the Order of the Owner or a Person Authorized by the Owner

From the testimony and documents introduced at trial, the court finds that the charges asserted by the SPA for dockage, wharfage, harbor master fees and labor constituted "necessaries" which were furnished to the vessels on the order of the vessels'

---

*Id.* at 49–50 (citations omitted).

5. Indeed, the defendants do not dispute that wharfage, dockage, harbor master fees and labor charges are "necessaries" and therefore maritime in nature and capable of lien status. *See infra* pp. 1365–66 & 1368–70 (court's discussion on the allocability of these charges and court's discussion of the propriety of defendants' defenses).

6. The testimony of two witnesses, John J. O'Donnell and Stephen Fox, provided evidence as to the nature of the container/chassis services regarding the defendant vessels. Stephen Fox, an employee of SEMCO since 1981 and a Line Manager for Topgallant, testified that virtually all "vesselized container services" took place while the defendant vessels were not at the dock. He testified that the "vesselized container services" had nothing to do with the ability of the defendant vessels to travel from Charleston to the next port-of-call. *See infra* p. 1365, notes 8–9 and accompanying text (explanation of John J. O'Donnell's testimony).

7. The term "vesselized services" refers to the container/chassis services.

8. Mr. O'Donnell was a graduate of the New York State Maritime College and sailed as a deck officer on cargo vessels in the merchant marine and Navy for some twenty-five years. From 1977 until his retirement in 1989, he was operations manager for a steamship agency in Charleston handling primarily containerized cargo.

9. Plaintiff's witnesses regularly referred to all services rendered by the SPA as being "necessary" to the vessels. The plaintiffs' witnesses' characterizations, however, do not support a finding that all services were "necessaries." Mr. O'Donnell's testimony was the more convincing and characterized the meaning of "necessaries" in what this court finds to be the proper perspective regarding lienable charges—those services directly related to or necessary for the loading, discharge or operation of the vessel.

Mr. O'Donnell was familiar with and had dealt regularly with the SPA during his duties as operations manager for Tricom Container Ship Agency. He retired from that position in 1989. Mr. O'Donnell specifically testified that the container/chassis services were not necessary for the operation of the defendant vessels.

masters or someone authorized by them to request these services.[10] The court concludes that these charges, totalling $118,781.76, are lienable charges.[11]

### 2. Necessaries Not Provided on the Order of the Owner or a Person Authorized by the Owner—Subcontractor Services

The charges asserted by the SPA for container crane rental, container equipment handling rental and stevedore usage present a somewhat different issue. Although these charges admittedly relate to the loading and discharging of cargo to and from the vessels,[12] they must, in order to qualify for maritime lien treatment, be shown to have been furnished on the authority of someone in a position to create a maritime lien.

The Federal Maritime Lien Act sets forth who is presumed to have authority to procure necessaries for a vessel as follows:

(a) The following persons are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) **an officer or agent appointed by—**

(A) the owner;

(B) **a charterer;**

(C) an owner pro hac vice; or

(D) an agreed buyer in possession of the vessel.

46 U.S.C. § 31341(a) (emphasis added).

 The charterer is deemed to be "entrusted with the management of the vessel." *The Golden Gate,* 52 F.2d 397, 399 (9th Cir. 1931); *The Penn,* 273 F. 990, 992–93 (3d Cir.1921); *See also Kaleidoscope Tours v. M/V TROPICANA,* 755 F.Supp. 382, 383 (S.D.Fla.1990). Thus, Topgallant is deemed to be "entrusted with the management of the vessels" and statutorily presumed to have authority to procure necessaries for the vessels. The issue before this court is whether Allsouth was an agent of Topgallant so as to fall under 46 U.S.C. § 31341(a)(4)(B) or whether Allsouth was an independent contractor. In other words, since a stevedore is not the shipowner and does not fall within the enumerated class of those with presumptive authority, the vessels can only be held liable for the rental charges if it is determined that Allsouth was the agent of the vessels, with the authority to bind them *in rem* to its own contractual commitments. *See Port of Portland v. The M/V PARALLA,* 892 F.2d 825, 827 (9th Cir.1989).

The defendants argue that Allsouth was an independent contractor hired by Topgallant for stevedoring services and that the equipment rental agreement between SPA and Allsouth was a subcontract to which neither the vessels nor Topgallant were parties. The SPA, however, argues that the arrangements for terminal services from the SPA were made by Topgallant itself or by an agent appointed by Topgallant and thus acting with presumptive authority to procure necessaries for the vessel.

Without justifying their conclusions,[13] the parties either assert that Allsouth was an agent of Topgallant (the SPA's view) or that Allsouth was an independent contractor (the defendants' view). Based on the following, this court agrees with defendants that Allsouth was an independent contractor. Allsouth was hired for its special knowledge and expertise in the field of stevedoring. Allsouth either provided its own tools to com-

---

**10.** The parties do not dispute that the wharfage, dockage, harbor master fees and labor charges are "necessaries."

**11.** Defendants' defenses of waiver and laches fail to preclude plaintiff's right to recover. *See infra* pp. 1368–70 (court's discussion of defenses).

**12.** Indeed, defendants do not dispute that these charges admittedly relate to the loading and discharging of cargo to and from the vessels, while the vessel is moored to a dock. This court therefore concludes that these charges are for "necessaries."

**13.** The court is referring to the parties' failure to cite any authority specifically referring to the issue of whether Allsouth should be regarded an agent or an independent contractor. The court's research found case authority generally referring to stevedores as independent contractors.

plete its stevedoring tasks or rented those tools from the SPA. Stevedoring is a distinct line of business and normally provided to vessels by individual companies, such as Allsouth. The contract between Topgallant and Allsouth provided for a fixed amount payment for the job—Allsouth was to handle the loading and discharging of containerized cargo on a flat rate per-container or "pick-rate" basis, which flat rate included the rental of container cranes and handling equipment necessary to effect the loading and discharge. Trial testimony also established that the flat rate or "pick-rate" also included an amount for the stevedore usage charge assessed by the SPA.

▆ The burden of proving the existence of an agency relationship is upon the party who seeks to rely upon it. *See Hofherr v. Dart Industries, Inc.*, 853 F.2d 259 (4th Cir. 1988). The SPA had the burden of proof to demonstrate facts which would make Allsouth an agent. The court finds that SPA has failed in its burden. Based on above findings of the court and on other evidence introduced at trial, this court concludes that Allsouth was granted no agency authority to bind the vessels *in rem* to its contractual commitments; rather, Topgallant hired Allsouth to perform stevedoring services, and the equipment rental agreement between the SPA and Allsouth was a subcontract to which neither the vessels nor Topgallant were parties.

It has long been recognized in admiralty that the services of an independent subcontractor do not give rise to a maritime lien. The leading case on this issue is *The JUNIATA*, 277 F. 438 (D.Md.1922). In that case, the owner of the steamship JUNIATA contracted with Globe Ship Building for certain repairs to that vessel. Being incapable of performing some of the required welding, Globe subcontracted the welding work to another outfit; the subcontractor completed the work and commenced suit *in rem* against the JUNIATA when Globe was adjudicated as bankrupt. *Id.* at 439. The court held that the welding subcontractor could not claim a maritime lien against the vessel, since the shipowner made its bargain with the Globe, and the Globe was not acting as the agent of

the vessel when it subcontracted for the welding work. *Id.* at 440–41.

Modern courts have continued to adhere to this approach. In *Bonanni Ship Supply, Inc. v. United States,* the Eleventh Circuit held that a subcontractor could not recover on a theory of *in rem* liability for work relating to lifeboats on a Navy vessel. 959 F.2d 1558 (11th Cir.1992). The general contractor listed no subcontractor when it submitted a bid for the work, there was no written or verbal agreement between the United States and Bonanni, and no government officers authorized to direct contractors had instructed Bonanni to perform the work. *Id.* at 1559. The court held that Bonanni was not a proper maritime lienor under the circumstances, because "it did not perform its work at the request of a person authorized to act for the vessel." *Id.* at 1564.

In *Sands Constr. Co. v. United Va. Bank,* 1985 A.M.C. 1165 (E.D.Va.1984), the shipowner entered into a contract with Sands for rudder repair work, and Sands subcontracted for particular tasks including diving and tug services. The subcontractors admitted that they had been contracted and hired by Sands' representatives, and that they had each delivered their service invoices to Sands. *Id.* at 1166. Citing *The JUNIATA* with approval, the court granted summary judgment in favor of the defendant shipowner, holding that "Sands' orders to its subcontractors without any evidence that the ship's owner directly authorized the hiring of the subcontractors, do not give rise to a maritime lien against the vessel." *Id.* at 1167. *See also Crescent City Marine, Inc. v. M/V NUNKI,* 1993 A.M.C. 1327, 1993 WL 61761 (E.D.La.1993) (maritime lien denied when vessel did not hire the subcontractor).

The Ninth Circuit recently followed this approach in a case which is factually similar to the one at bar. In the case of *The PARALLA,* 892 F.2d 825, the shipowner (Automar) hired a general contractor (Northwest) to refit the PARALLA for sale to the United States Government. Northwest thereafter entered into an agreement with the Port of Portland, Oregon, wherein the Port agreed to provide its facilities to Northwest for use in the conversion project. Automar was not a party to this contract, although Automar rep-

resentatives did attend negotiation meetings between the Port and Northwest, and Automar was undoubtedly aware that Northwest would have to use the Port's facilities. *Id.* at 826–28. The court reaffirmed the rule of *The JUNIATA* and held that the Port could not claim the right to a maritime lien on the vessel, since the Port had dealt exclusively with Northwest and Northwest did not have authority to bind the vessel. *Id.* at 828.

The pertinent facts in this case closely parallel those of *The PARALLA.* Like the Port of Portland, the SPA agreed to provide cranes and container handling equipment to the stevedore, Allsouth, rather than directly to the vessel or to Topgallant. Although Topgallant was undoubtedly aware that Allsouth would have to use the SPA equipment, *The PARALLA* court clearly held that such knowledge, absent an explicit directive, is not enough to confer authority on Allsouth to incur liens against the vessels. It is also significant here that the vessels and the SPA were not in contractual privity.

Allsouth's stevedoring charges invoiced to Topgallant included a certain amount to compensate Allsouth for its SPA equipment rental and terminal usage fees. Allsouth billed Topgallant for these services and has asserted its own *in rem* claim against the vessels, indicating that Allsouth understood the rental arrangement to be a subcontract between itself and the SPA. Since the SPA's services and equipment were not ordered by a person with actual authority to incur liens against the defendant vessels, and since a stevedore is not one of the persons with presumptive authority to incur liens under the Federal Maritime Lien Act, this court concludes that the SPA cannot claim that its rental of cranes and container handling equipment to Allsouth, nor its stevedore usage fees, give rise to a maritime lien against the defendant vessels.

## D. Defenses To Recovery

### 1. Lien Prohibition Clause

■ The vessel interests have raised the "prohibition of lien clause" in the charter

party as evidence of lack of authority of Topgallant to order services on the vessel credit. The evidence shows that the SPA was not a party to that agreement, nor did it have actual knowledge of the lien prohibition clause. As seen below, this court concludes that the lien prohibition clause will not prevent the SPA's recovery.

■ A purpose of the Federal Maritime Lien Act is to help suppliers determine who has authority to incur a lien. *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY,* 869 F.2d 473, 478 (9th Cir.1988). "The [Lien] Act's presumption in favor of granting liens to suppliers 'was enhanced in 1971 when Congress deleted the requirement that materialmen inquire about the existence of any no-lien clauses before furnishing supplies.' " *Id.,* citing *Farwest–Steel Corp. v. Barge Sea– Span 241,* 769 F.2d 620, 623 (9th Cir.1985).[14] Since the 1971 amendments to the Lien Act, courts have uniformly held that a lien prohibition clause is not effective to rebut a statutory presumption of authority to acquire a lien *without proof of the supplier's actual knowledge of the clause. Id.* at 479. This court agrees and concludes that the purposes of the Lien Act, in light of the 1971 amendments, would be thwarted if the actual knowledge inquiry was not followed and undertaken.

The evidence was consistent in this case that the SPA had no actual knowledge of any lien prohibition clause. Thus, the lien prohibition clause will not act to prohibit the creation of a lien.

### 2. Waiver and Laches Defenses

#### a. Waiver

■ Under the Federal Maritime Lien Act, one providing necessaries to a vessel need not prove that credit was given to the vessel; the services are presumptively provided on the credit of the vessel. *Crustacean Transp. Corp. v. Atalanta Trading Corp.,*

---

**14.** Prior to 1971, 46 U.S.C.App. § 973 imposed a duty of "reasonable diligence" to inquire and determine whether the person ordering goods or services was without authority to bind the vessel.

The list of persons presumed to have authority to procure necessaries for a vessel is now codified at 46 U.S.C. § 31341, as cited above.

369 F.2d 656, 660 (5th Cir.1966). One attacking the presumption has the burden of proof. *Id.* The Act states that "a person providing necessaries to a vessel . . . is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C. § 31342(a)(3).

■ The defendants argue that SPA waived its right to claim liens against these vessels by virtue of its conduct. The defendants argue that the evidence indicates that prior to permitting Topgallant to commence its operations at Charleston or to allow its vessels to use the SPA's facilities, Topgallant's steamship agent at Charleston, SEMCO, was required to personally guarantee Topgallant's debts. Defendants further argue that the fact that SPA was relying on the personal guarantee, rather than upon the vessels to extend continued credit to Topgallant, is evidenced by its actions following Topgallant's bankruptcy when it opted to pursue the guarantees of SEMCO and Allsouth rather than intervening and asserting its lien claims against the vessels under arrest in Europe. The court cannot agree with defendants' conclusions.

The testimony at trial overwhelmingly demonstrated that the SPA, contrary to the allegations of the defendants, has done nothing to waive its liens. There is simply no evidence that the SPA waived its right to maritime liens for necessaries. The testimony establishes the opposite: the SPA always relies on the vessel credit in providing services. At best, the evidence shows additional security was taken by the SPA without in any way relinquishing its right to lien the vessels.[15] The court finds that this conclusion more aptly coincides with the totality of the evidence on the record before it.

### b. Laches

■ The defendants next assert the defense of laches. To prove laches, the defendants must show unreasonable delay in asserting the lien, and that the debtor substantially altered his position to his prejudice as a result of the delay. *See generally* 2 *Benedict on Admiralty* § 62, pp. 5–8 & 5–9 (7th Ed.1990). Laches requires both inexcusable delay and prejudice. *Stevens Technical Services, Inc. v. SS BROOKLYN,* 885 F.2d 584, 588 (9th Cir.1989).

■ Defendants argue that the SPA's delay in asserting its lien claims deprived FABC of its right of indemnity. The defendants argue that it would be inequitable to keep the claim against the vessels alive when the SPA continued to supply credit to Topgallant despite its delinquency.

The SPA had several witnesses who testified that a debtor being 90 days in arrears was not that unusual or alarming. Therefore, the SPA's continuing to supply credit to Topgallant despite its approximate 90 day delinquency was not that unreasonable. Further, SPA attempted to protect its interest by calling in SEMCO's and Allsouth's guarantees when Topgallant went into bankruptcy. It was after SEMCO and Allsouth ceased making payments on the settlement agreement reached with plaintiff, approximately six months after the bankruptcy, that the SPA asserted its lien claims.

Defendants admit that the vessels were under arrest in Europe from December 1989 until the summer of 1990 and that they did not return to the United States until October 1990. They also admit that FABC received monthly audit reports from monthly review of Topgallant books, which reported outstanding "potential maritime lien claims" against the subject vessels, including amounts allegedly owed the SPA during September through November 1989.[16]

■ It is true, as defendants argue, that the SPA made no attempts to intervene in the proceedings regarding the arrest of the

---

**15.** Trial testimony indicated that this additional security was taken since Topgallant was a new container shipping line.

**16.** John Benton, the Vice–President and Treasurer of Topgallant in 1989, testified that FABC monitored the Topgallant line by auditing Topgallant's books every month. This monitoring was done to determine the amount of maritime liens on the vessels. He testified that FABC knew of the financial condition of Topgallant by review of these monthly audit reports. Apparently, the FABC attorneys would monitor the reports and call Mr. Benton to discuss any matters regarding those reports.

two vessels in Bremerhaven from December of 1989 to the Fall of 1990. There are authorities, however, that find where the vessel is abroad for most of the time between the last provision of necessaries and the commencement of suit, laches will not bar:

> If the vessel is abroad or out of the claimant's reach for a substantial portion of the time between accrual of the lien and the attempt to enforce it, laches will not be an adequate defense.

2 *Benedict on Admiralty* § 62, p. 5–13. As stated in *Bermuda Express, N.V.*:

> We accept the principles from the *Everosa* cases that **lienors are not required to attempt to enforce their liens in foreign waters** and that the existence of a reasonable opportunity to arrest the vessel before the purchase is an important factor in the laches analysis.

872 F.2d at 559 (emphasis added). After leaving Charleston in December 1989, the vessels admittedly never returned to Charleston until after issuance of the letter of undertaking; the earliest call of either vessel to a United States port was that of the TYSON LYKES (ex DELAWARE BAY) the day before the letter of undertaking was issued to the SPA.

■ In addition, the fact that this action was commenced well within the state statute of limitations, while not controlling, is a consideration of the court in ruling on laches. *Phelps v. The Cecelia Ann,* 199 F.2d 627 (4th Cir.1952) (involving innocent purchaser). "When the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be." *Larios v. Victory Carriers, Inc.,* 316 F.2d 63, 66 (2d Cir.1963). The court finds that there was no unreasonable delay by the SPA given the facts before this court.

Defendants also fail to show prejudice. FABC was the original owner of the vessels. It monitored Topgallant's books; it kept apprised of the monthly list of potential maritime liens, including those of the SPA; it contacted the SPA and gave a Letter of Undertaking for those potential liens in October of 1990 before bringing the vessels back into port. This court finds no prejudice to defendants.

Based on the above, this court concludes that the defense of laches will not prohibit the SPA's otherwise properly lienable claims.

### IV. CONCLUSION

It is therefore,

**ORDERED,** that the dockage, wharfage, harbor master fees and labor qualify as necessaries furnished on the order of the master or some other authorized person and are properly lienable charges. The lienable charges total $118,781.76.

**ORDERED,** that the container crane and container handling equipment rental charges and stevedore usage charges qualify as necessaries, but were not furnished on the order of an agent of the charterer and are therefore not lienable charges.

**ORDERED,** that the container/chassis service charges are non-maritime in nature and therefore this court lacks subject matter jurisdiction over such claims and dismisses them for lack of jurisdiction.

**AND IT IS SO ORDERED.**