**LIVERPOOL AND LONDON STEAM-SHIP PROTECTION & INDEMNITY ASSOCIATION LIMITED**

v.

**M/V ABRA (ex Kappa Unity), In Rem**

**No. CIV.A.01–136–D.**

United States District Court,
M.D. Louisiana.

Nov. 19, 2003.

See also 296 F.3d 350.

---

**86.** 668 So.2d 1292 (La.App. 5th Cir.1996), *writ denied,* 671 So.2d 340 (La.1996).

Peter B. Sloss, Charles B. Wallace, Murphy, Rogers & Sloss, New Orleans, LA, for plaintiff.

Paul S. West, McGlinchey Stafford PLLC, Baton Rouge, LA, Daphne P. McNutt, John H. Clegg, McGlinchey Stafford, PLLC, New Orleans, LA, for defendant.

### MEMORANDUM RULING

BRADY, District Judge.

A bench trial in this maritime dispute began on June 24, 2002 and ended June 25, 2002. Having considered the admissible evidence, the credibility of the witnesses' testimony, the arguments of counsel presented at trial, and the relevant law, this Court grants judgment in favor of Liverpool and London Steamship Protection & Indemnity Association Limited, ("Liverpool and London" or "L & L") and against the M/V Abra (ex Kappa Unity) and Interforce Shipping Company ("Interforce"), as claimant, for the reasons more fully explained below.

### I. FACTUAL BACKGROUND AND SUMMARY OF ARGUMENTS

This suit was brought by L & L to enforce an *in rem* maritime lien against the M/V Abra (ex Kappa Unity) for necessaries provided to the vessel, more specifically, a form of marine "insurance." In addition, L & L seeks to enforce a breach of contract lien against the M/V Abra for "insurance" provided to other vessels in the fleet managed by Kappa Shipping Company, Ltd. ("Kappa Shipping" or "Kappa"). L & L is a not-for-profit English mutual insurance association. The M/V Abra (ex Kappa Unity) was owned by Interforce at the commencement of this litigation.

Beginning on August 9, 1994 through February 20, 2000, the M/V Abra, at that time known as the M/V Kappa Unity and owned by Cordax Shipping Company Ltd. ("Cordax"), was entered into the Liverpool & London association along with other vessels managed by Kappa Shipping as part of a plan to obtain marine "insurance." Membership in L & L allowed individual members to obtain Protection & Indemnity coverage ("P & I") and Freight, Demurrage and Defense coverage ("FD & D") for various vessels entered. P & I covers risks such as, personal injury, cargo, or collision claims. FD & D covers costs associated with legal fees or experts when

litigation arises out of a member's ownership, management or operation of one of its vessels entered into the association.

As stated above, Liverpool and London is a mutual insurance association or club. It operates on a mutual basis by insuring liability incurred by its members in the operation of their entered vessels. A member's contributions are pooled with those of the other members to pay for losses by various members that may arise from time to time. The terms and conditions of coverage are set forth in the Liverpool and London association rules published each year.

The contributions are referred to as "calls" (similar to insurance premiums) calculated on a per ton and per vessel basis. There are three main types of calls: advance, supplementary, and release. First, advance calls are paid by members to cover potential claims for the upcoming year. Generally, advance calls are issued as a percentage of the estimated liability of the vessels for a given year. Second, Since advance calls cover a percentage of the estimated liability, budgeted supplementary calls reflect the remainder of the expected liabilities. However, if the Association's liabilities exceed the estimates, unbudgeted supplementary calls must be issued. Finally, when a member withdraws from an Association, the Association estimates that member's future liability for supplementary calls for the policy years that remain open at the time of withdrawal and then issues release calls. Like advance and supplementary calls, release calls are debited on a per vessel basis.

Beginning in or around late 1998, the world shipping market suffered a depressed economic situation. As a result, several of L & L's members, including Kappa Shipping, were unable to pay certain unbudgeted supplementary calls in full. Consequently, Liverpool and London agreed to enter into an installment plan with Kappa Shipping and other members to pay the calls. Meanwhile, current calls became due.

On May 20, 2000, Interforce entered into a Memorandum of Agreement to purchase the M/V Abra (Ex Kappa Unity) from Cordax.[1] On June 9, 2000, the sale was finalized in a Bill of Sale.[2] In June 2000, Kappa ceased making payments on the installment plan. Subsequently, L & L terminated the membership of Kappa, ceased its coverage of on the M/V Abra (ex Kappa Unity) and issued release calls on the vessel. L & L then began searching various ports of call via computer in an effort to arrest the M/V Abra.

On February 9, 2001, this court issued an order arresting the M/V Abra (ex Kappa Unity) (doc. 5). At the time, the vessel was located on the Mississippi River within the venue of this court. In its complaint for the arrest of the M/V Abra, L & L alleged that it was owed $229,102.16, plus interest, for the insurance coverage it provided to the M/V Abra from August 9, 1994 through February 20, 2000 (doc. 1). On February 12, 2001, Interforce moved this court to set security for the release of the M/V Abra and filed a counterclaim against Liverpool and London seeking damages for wrongful arrest of the vessel. On February 14, 2001, L & L amended its complaint to include a breach of maritime contract claim and claimed a lien for that breach on the M/V Abra (ex Kappa Unity) for amounts owed to L & L for unpaid calls on all vessels entered as a fleet entry through Kappa Shipping (doc. 18). The amended complaint brought the total amount sought from the Abra to $829,509.66.

1. L & L, Ex. 11

2. L & L, Ex. 12

In addition, Liverpool and London requested that security be set at $1,200,000. After a hearing, the court set the amount of security at the requested amount.

On February 16, 2001, Interforce filed a motion to vacate the wrongful arrest of the M/V Abra (doc. 23). Interforce asserted that English law applied to the present case and under English law no relief existed for L & L. On April 16, 2001, this court ruled on Interforce's motion. This court held that United States substantive law applied under the facts of the arrest; however, a prima facie case was only made for a maritime lien to exist on the M/V Abra for the unpaid calls for insurance provided to the M/V Abra and not for insurance provided to the Kappa fleet. Therefore, the security for the M/V Abra's release was reduced from $1,200,000 to $300,000. L & L appealed the ruling that L & L had no basis for a breach of maritime contract lien that assessed the unpaid calls from the Kappa fleet as a lien on the Abra and, as a result, reduced the amount of security to the United States Court of Appeals for the Fifth Circuit (doc. 50). The appeal was subsequently dismissed without prejudice.

However, on August 2, 2001, Interforce filed a motion for reconsideration or certification of interlocutory order under 28 U.S.C. § 1292(b) urging this court to reconsider its ruling that United States law, and not English law, applied to the facts of the case. The basis of Interforce's motion was a ruling by Judge Lemmon of the United States District Court for Eastern District of Louisiana that involved an almost identical issue but was decided differently. Liverpool and London did not oppose the certification.

On August 15, 2001 this court denied Interforce's motion for reconsideration, however, it granted its motion for certification of the interlocutory order. On September 26, 2001,the United States Court of Appeals for the Fifth Circuit granted Interforce's petition for leave to appeal from an interlocutory order (doc. 78). Ultimately, the Fifth Circuit affirmed this court's ruling that the substantive law of the United States applied to the facts of this case.[3]

On September 17, 2002, Interforce filed a motion for summary judgment (doc. 84). L & L responded with its opposition and urged this court *sua sponte* to grant summary judgment in its favor (doc. 89). The court ruled on February 5, 2003, denying both parties' requests for summary judgment (doc. 95). Following various pre-trial briefs, a bench trial was held on June 24, 2002 and June 25, 2002.

The crux of L & L's arguments in support of its claims are that: (1) it retains a necessaries lien, plus interest on the amount, for unpaid "calls" on the M/V Abra (ex Kappa Unity) because marine insurance is a "necessary" and a claim for unpaid insurance premiums gives rise to a statutory maritime lien against the covered vessel under 46 U.S.C. § 31301, et seq.; and (2) it retains a breach of maritime contract lien for all unpaid "calls" of other vessels in the Kappa Shipping fleet entry because Liverpool and London's rules provided that vessels in a fleet entry were jointly and severally liable for amounts owed by the entire fleet.

Conversely, Interforce, as claimant of the M/V Abra (ex Kappa Unity), argues that: (1) L & L cannot have maritime lien because the insurance was provided to a fleet of vessels and not to the vessel individually; (2) that there is no basis in law for a breach of maritime contract lien in which a vessel is jointly and severally liable for the debts of other vessels in a fleet; (3) that L & L's reliance on the personal

---

**3.** *Liverpool and London S.S. Protection and Indem. Ass'n Ltd. v. QUEEN OF LEMAN MV,* 296 F.3d 350 (5th Cir.2002).

credit of a third party and not the vessel precludes any assertion of a maritime lien for the unpaid "calls"; (4) that Liverpool and London's association was involved in a joint venture with the owner/operators it insured, and therefore, it may not avail itself of a maritime lien under United States law; (5) that since FD & D is not a "necessary" under maritime statutory law, no maritime lien exists for FD & D coverage; (6) that English law applies to the 1994 and 1995 policy years and English law does not recognize a lien for insurance premiums; (7) that L & L commingled lien and non-lien items and included non-lien items in its *in rem* claim, thereby precluding enforcement of any liens that may have existed; (8) that unbudgeted supplementary calls and release calls are not properly assessed because Kappa Shipping was not bound to pay them or, alternatively, that the alleged debt for release calls did not arise until after Kappa Shipping alienated the vessel, at which time Kappa had no statutory authority to bind the vessel; (9) that the doctrine of laches should bar enforcement of any lien rights that might be found to exist; (10) that L & L cannot have a maritime lien for any portions of its claim reflecting assessments of contractual interest because contractual interest is not a part of a maritime lien; and (11) that damages should be awarded to Interforce on its counterclaim.

4. *Silver Star Enterprises, Inc. v. SARAMACCA MV*, 82 F.3d 666, 668 (5th Cir.1996)(quoting *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries*, 254 U.S. 1, 9, 41 S.Ct. 1, 65 L.Ed. 97 (1920)).

5. *Id.* (quoting *Dampskibsselskabet Dannebrog, et al. v. Signal Oil & Gas Co.*, 310 U.S. 268, 280, 60 S.Ct. 937, 84 L.Ed. 1197 (1940)).

6. *Id.* (quoting *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir.1986)(en banc)).

7. *E.A.S.T., Inc. of Stamford, Conn. V. M/V ALAIA*, 876 F.2d 1168, 1174 (5th Cir.1989); see also *Cardinal Shipping Corp. v. M/S Seisho*

## II. ANALYSIS AND CONCLUSIONS

### A. The Nature of a Maritime Lien (The Basis of L & L's claims)

■ A maritime lien is a special property right in a vessel that "developed as a necessary incident of the operation of vessels." [4] The lien secures creditors who provide "supplies which are necessary to keep the ship going." [5] It "arises in favor of the creditor by operation of law... and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." [6] In addition, a maritime lien "affords special protection to [a] party who has been injured by a breach of [maritime] contract...." [7]

■ The maritime lien is a unique security device, that serves the purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away.[8] It is a lien on the vessel, "and only indirectly, inasmuch as it conflicts with the owner's rights in the vessel, it is connected with the owner." [9] The concept, in effect, somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner.[10] The Fifth Circuit examined the legal fiction of the personality of the vessel in *E.A.S.T., Inc. of Stamford, Conn. v. M/V ALAIA*, 876 F.2d 1168 (5th Cir.1989) when it commented:

*Maru*, 744 F.2d 461, 466 (5th Cir.1984) (noting that a maritime lien "arises by operation of law to provide security to the victims of certain maritime ... contract breaches.").

8. *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir.1986)(en banc).

9. *Id.* (quoting *Pierside Terminal Operators, Inc. v. M/V FLORIDIAN*, 389 F.Supp. 25, 26 (E.D.Va.1974)).

10. *Id.* at 602.

A maritime lien is not, like a dry-land lien, a security interest arising from a personal obligation of a vessel's owner under a contract. A maritime lien is based instead on the fiction that the vessel may be a *defendant* in a breach of contract action when the vessel has begun to perform the contract.[11]

█ Finally, "[m]aritime liens are stricti juris and will not be extended by construction, analogy, or inference."[12] Therefore, to determine the validity of a maritime lien, courts must normally refer to statutory law or those liens that have been historically recognized in maritime law.[13]

### 1. L & L's Necessaries Lien Claim

Liverpool and London claims that it retains a "necessaries" lien under 46 U.S.C. § 31342 for unpaid calls debited to the M/V Abra. It argues that the unpaid calls are, in effect, marine insurance premiums and, as such, give rise to a statutory maritime lien against the vessel. Interforce does not dispute whether marine insurance premiums give rise to a statutory maritime lien, nor does it dispute that the unpaid calls are in the nature of insurance premiums. However, Interforce does assert that because of the characteristics and actions of L & L, no maritime lien attached in the present case.

█ After nearly 20 years, it is axiomatic that insurance is a "necessary" under 46 U.S.C. § 31342 and that unpaid insurance premiums give rise to a statutory maritime lien.[14] Furthermore, other federal courts have held that mutual insurance association calls are the equivalent of insurance premiums.[15] Therefore, since a type of insurance was provided to the M/V Abra by Liverpool and London and because the calls were left unpaid, a "necessaries" lien attaches to the M/V Abra for the amounts of the unpaid calls, unless the lien, or certain amounts included as part of it, are invalid or improper.

### 2. L & L's Breach of Maritime Contract Lien Claim

█ In addition to the "necessaries" lien, Liverpool and London claims that it retains a breach of maritime contract lien for all unpaid calls of other vessels in the Kappa Shipping fleet entry because Liverpool and London's rules provided that vessels in a fleet entry were jointly and severally liable for amounts owed by the entire fleet. In a previous ruling, the court addressed this claim and found it had no legal support. However, the court will briefly revisit Liverpool and London's claim.

The basis of L & L's breach of maritime contract lien lies in two provisions in the association rules.[16] Rule 5.E. of the 1999 Liverpool and London handbook provides:

11. *Id.* at 1174. (emphasis in original and citations omitted).

12. *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 192 (5th Cir.2000)(citing *Piedmont*, 254 U.S. at 12, 41 S.Ct. 1).

13. *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 224 (5th Cir.1999).

14. *See Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir.1986)(en banc).

15. *See Caterpillar Financial Services Inc. v. Aleutian Chalice*, 1994 A.M.C. 1767, 1994 WL 468187 (W.D.Wash., 1994)(finding that for the purpose of determining what constitutes a maritime lien, calls are the same as premiums); *West of England Ship Owners Mut. Protection & Indem. Asso. (Luxembourg) v. Patriarch Steamship Co.*, 491 F.Supp. 539, 541 (D.Mass.1980) (calls and assessments are the "general equivalent of insurance premiums").

16. Although the Association Rules for each policy year relevant to this case, 1994 through 1999, differ somewhat, for purposes of this section of the opinion, the court will refer to the 1999 Rules. The applicable provisions

Applications for insurance may be made and accepted in respect of ships of which the beneficial ownership is separate on terms that the ships concerned shall be deemed (for these insurance purposes only) to form part of a specified fleet whereby the Association shall deal with the entries of such ships in combination and not individually, in consideration for which all *members* within each such fleet entry shall accept joint and several liability to pay all amounts due to the Association by way of calls or otherwise in respect of all ships within that fleet entry. Such joint and several liability shall continue after cessation of entry in respect of all amounts due to the Association.[17]

Further, Rule 40 of the 1999 Liverpool and London handbook provides, "[t]he Association shall have a lien on the ships of a member (including those of a co-assured) for any amounts owed to the Association by the member."[18] L & L's novel argument maintains that L & L's rules "explicitly provide,"[19] in consideration for lower rates, that vessels entered for coverage in the fleet entry are jointly and severally liable for all amounts owed on the fleet, therefore, the vessel entered into a contractual agreement to be responsible for the payment of insurance provided to other vessels in the fleet and L & L retains a lien on that amount.

First, the rules do not state that the "vessels" are jointly and severally liable; the rules state that "members" are jointly and severally liable. Therefore, the rules do not lend support to the argument. Second, L & L has cited no case that supports the proposition that a vessel can be jointly and severally liable with other vessels under a breach of maritime contract claim. Indeed, no case or statute exists for the proposition. Therefore, since maritime liens are *stricti juris* and cannot be extended by construction, analogy, or inference, and because this claim has no support in law, the claim seeking a breach of maritime contract lien for all unpaid calls of other vessels in the Kappa Shipping fleet entry must fail.

**B. Interforce Defenses**

**1. No maritime necessaries lien exists because the insurance was provided to the Kappa Shipping fleet and not to the M/V Abra individually**

 Interforce asserts a number of defenses to L & L's necessaries lien claim against the M/V Abra. First among the defenses is that L & L cannot claim a necessaries lien because the insurance was provided to the Kappa Shipping fleet as a whole and not to the M/V Abra individually. Interforce's basis for this defense is 46 U.S.C. § 31342, which provides that a maritime lien for necessaries exists only when those necessaries are provided[20] "to the vessel."

In *Piedmont & Georges' Creek Coal Co. v. Seaboard Fisheries*,[21] the United States Supreme Court decided a case involving a coal company that sought a maritime lien on several vessels that utilized the company's coal. The coal company and the prior

are not significantly different and do not affect the analysis.

**17.** L & L Ex. 1(a)(emphasis added).

**18.** L & L Ex. 1(a).

**19.** Liverpool and London, Post–Trial Memorandum, p. 17 (doc. 124).

**20.** The prior version of the FMLA used the word "furnished" instead of "provided." The words are synonymous and the difference is inconsequential.

**21.** 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920).

owner of the vessels entered into an agreement whereby the coal supplier would provide coal to the vessels and the factories of the prior owner.[22] However, no coal was supplied directly to the vessels and no understanding was ever reached that any of the coal was for any vessel of the fleet.[23] Therefore, the Court held that no maritime lien existed because the coal was furnished to the owner of the vessels with no understanding that any part of the coal was earmarked for any particular vessel.[24]

In the present case, the insurance coverage was provided to each vessel because the Certificates of Entry [25] earmarked insurance for each particular vessel. The Certificates of Entry provided L & L with a ship name and tonnage in order for calls to be assessed.[26] Whether L & L billed Kappa the full amount of its fleet entry without allocating the calls among the vessels as asserted by Interforce at trial and in its pre-trial and post-trial briefs, is immaterial. The Certificates of Entry, not L & L or Kappa's method of accounting, earmarked the insurance provided to each particular vessel by identifying the ship and indicating a tonnage for each vessel. Consequently, L & L provided marine insurance to the M/V Abra (ex Kappa Unity). Therefore, Interforce's contention that a maritime necessaries lien does not exist because the insurance was provided to the Kappa Shipping fleet as a whole and not to the M/V Abra (ex Kappa Unity) individually is without merit.

**2. No basis in law exists for a breach of maritime contract lien in which a vessel is jointly and severally liable for the debts of other vessels in a fleet.**

In addition, Interforce contends that L & L's claim that it retains a breach of maritime contract lien for all unpaid calls of other vessels in the Kappa Shipping fleet entry because Liverpool and London's rules provided that vessels in a fleet entry were jointly and severally liable for amounts owed by the entire fleet is wholly without merit and has no basis in law. The court agrees with Interforce for the reasons set forth in this opinion in Section II.A.2.

**3. L & L's reliance on the personal credit of a third party and not the vessel precludes any assertion of a maritime lien for the unpaid "calls"**

 As a further defense, Interforce argues that L & L does not maintain a lien on the M/V Abra (ex Kappa Unity) because the evidence demonstrates that L & L relied on the credit of Kappa Shipping and not on the credit of the vessel. Interforce asserts that because the lien arises against the ship, only creditors that rely on the credit of the ship, not owner of the ship or a third party, are entitled to a lien. Interforce points to the testimony of Mr. Peter Bernie and to the nature of the installment agreement L & L and Kappa entered into in support of this reliance argument.

---

22. *Id.*

23. *Id.*

24. *Id.* at 11, 41 S.Ct. 1. *See also Silver Star Enterprises, Inc. v. SARAMACCA MV*, 82 F.3d 666, 668 (5th Cir.1996)(holding that lessor of cargo containers to shipping company did not give rise to "necessaries" lien where containers were leased in bulk and not earmarked for

any particular vessel); *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183 (5th Cir.2000)(following the reasoning of *Piedmont* and *Silver Star* to hold that certain equipment and services were not provided to the vessels).

25. L & L Ex. 2, 3(a)-(c).

26. L & L Ex. 2, 3(a)-(c).

46 U.S.C. § 31342(a)(3) provides that a person providing necessaries to a vessel "is not required to allege or prove in the action that credit was given to the vessel." Therefore, under 46 U.S.C. § 31342(a), a presumption arises that one providing necessaries to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of proving that the personal credit of the owner or another third party was solely relied upon.[27] "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien."[28] However, the Fifth Circuit, assessing the heavy burden, has stated that, "[e]ven under the best of circumstances this proposition is difficult to sustain."[29] Only when there has been direct testimony from the supplier that it relied *solely* on the personal credit of its customer and did not rely on the credit of the vessel has the presumption been overcome.[30]

Moreover, the Fifth Circuit has expressed that "[b]ecause the statutory presumption in favor of a maritime lien is a strong one, we are usually reluctant to conclude that a supplier has waived its lien."[31] Therefore, to succeed in proving that the creditor did not rely on the credit of the vessel, Interforce must show that the Liverpool and London "*deliberately intended* to forego the valuable privilege which the law accords and look solely to the owner's [or a third party's] personal credit [emphasis added]."[32] In the present case, Interforce has failed to overcome its burden of proving that L & L looked solely to the credit of a party other than the vessel.

Interforce points to the testimony of Mr. Peter Bernie, the CFO of Liverpool and London, in an effort to overcome its burden. Interforce argues that, at trial, Mr. Bernie testified that as long as Kappa Shipping remained a member in the Association, *any* ship entered in the Association would be covered by the Association. Further, Interforce asserts that Mr. Bernie conceded that if Kappa had divested itself of all of its vessels and entered new ones in the Association, L & L would have looked to the newly entered vessels for payment of unpaid "calls" due on the previously entered vessels. Therefore, Interforce urges, L & L relied on Kappa's ongoing membership, not the credit of the individual vessels.

There is no doubt, from the testimony of Mr. Bernie, that L & L relied on the credit of Kappa Shipping in its dealings involving vessels in the Association. However, the testimony does not prove that L & L *deliberately intended* to forego its lien rights by relying solely on the credit of Kappa Shipping. Indeed, while the last thing L & L desired was a ship seizure, Mr. Bernie testified that L & L always kept that option open. Mr. Bernie testified at trial concerning L & L's desire to avoid seizing the ships of members, not because it wanted to forego its lien, but because a better price could be obtained on the open market which would pay off more of the debt the ship incurred and would be in the members' best interest. Therefore, L & L's reliance on the credit

27. *Equilease,* 793 F.2d at 605.

28. *Id.*

29. *Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743, 750 (5th Cir.1985)(quoting *Sasportes v. M/V SOL DE COPACABANA,* 581 F.2d 1204, 1208–09 (5th Cir.1978)).

30. *Equilease,* 793 F.2d at 605–06.

31. *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.,* 348 F.3d 469, 471–72 (5th Cir.2003).

32. *Id.* at 472–73 (citing *Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743, 750 (5th Cir.1985)).

of the entered vessels, more specifically, the M/V Abra (ex Kappa Unity), as a "fallback position" is in accord with the law, and Interforce has failed to overcome its burden.[33]

Furthermore, Interforce argues that since some of the vessels for which there were debts renegotiated under the installment plan were no longer part of the Association, L & L could not have relied solely on the credit of the vessels. However, it is irrelevant whether the debts of vessels no longer within the Association are included within the installment agreement. The issue is whether Interforce can overcome its burden and prove that L & L relied solely of the credit of someone other than the M/V Abra (ex Kappa Unity) when it provided insurance to the vessel. Contrary to Interforce's assertions, agreeing to a payment schedule does not waive a lien.[34] Indeed, it would make no sense to require that a lien holder foreclose its lien, to the detriment of a vital business relationship, prior to attempting to collect payment through customary means.[35] That L & L may have relied upon Kappa Shipping's credit to some extent in arranging the installment plan is insufficient. Interforce has failed to show that L & L relied solely on the personal credit of Kappa Shipping by entering into the installment plan.

Regarding this issue, evidence relied on by Interforce, at best, reveals that Liverpool and London engaged in rather haphazard business and accounting practices. However, such practices are not sufficient to overcome the heavy burden Interforce

has in demonstrating that L & L waived its necessaries lien by relying on the credit of a party other than the vessel. Therefore, Interforce's assertion that L & L relied solely on the credit of a party other than the M/V Abra (ex Kappa Unity) is without merit.

**4. Liverpool and London's association was involved in a joint venture with the owner/operators it insured, and therefore, it may not avail itself of a maritime lien under United States law.**

Also, Interforce argues that since L & L was involved in a joint venture with Kappa Shipping, it may not avail itself of a maritime lien under U.S. law. Interforce claims that L & L and Kappa's relationship was that of co-venturers, and not an arm's length relationship typical of insurance companies and insureds. Interforce asserts that since the Association was made of members with shared interests and risks for the purpose of a particular venture, providing insurance, the Association and members constitute a joint venture. However for the reasons set forth below, this court disagrees.

While the presumption in favor of a maritime lien is strong, "[j]oint venturers cannot hold maritime liens because they are not 'strangers to the vessel.'"[36] A joint venturer does not rely on the credit of the vessel, but on the credit of the co-venturer.[37] Moreover, a joint venture has been defined as a special combination of two or more persons or entities, where in

33. See Maritrend, Inc. v. Serac & Co. (Shipping) Ltd., 348 F.3d 469, 471–72 (5th Cir. 2003).

34. Crustacean Transp. Corp. v. Atalanta Trading Corp., 369 F.2d 656, 660 (5th Cir.1966).

35. Stevens Technical Services, Inc. v. SS Brooklyn, 885 F.2d 584, 587 (9th Cir.1989).

36. Sasportes v. M/V SOL DE COPACABANA, 581 F.2d 1204, 1208 (5th Cir.1978)(quoting P.T. Perusahaan Pelayaran Samudera Trikora Lloyd v. Salzachtal, 373 F.Supp. 267, 275 (E.D.N.Y.1974)).

37. Fulcher's Point Pride Seafood, Inc. v. M/V THEODORA MARIA, 935 F.2d 208, 211 (11th Cir.1991).

some specific venture a *profit* is jointly sought in the absence of an actual partnership or corporate designation.[38] Furthermore, the Fifth Circuit has considered the following factors when considering whether a joint venture exists:

> The parties' intentions are important. Joint ventures involve joint control or the joint right of control, and joint proprietary interests in the subject matter of the venture. Both venturers share in the profits, and both have a duty to share in the losses. But of course these elements cannot be applied mechanically.[39]

■ Interforce's argument that L & L's relationship with Kappa Shipping, as operator of the M/V Abra (ex Kappa Unity) and as a member of the Association, wherein insurance that was provided to the M/V Abra (ex Kappa Unity) was provided as part of a joint venture between L & L and Kappa Shipping is wholly without merit. Interforce's focus on the unique nature of the business of providing insurance to ships involved in worldwide commerce to prove that a joint venture exists is unavailing. Indeed, setting aside the fact that the venture was not a profit seeking venture because L & L is a non-profit association, the factors listed by the Fifth Circuit to determine whether a joint venture exists, although not applied mechanically, do not lend support to the joint venture proposition. First, L & L retains no control or proprietary interest in the subject matter of the venture—the M/V Abra (Ex Kappa Unity). Second, L & L does not share in the profits or losses of Kappa Shipping or the M/V Abra (Ex Kap-

pa Unity). Finally, no evidence of intent to form a joint venture was put forth.

Moreover, the evidence Interforce points to in order to support its proposition of a joint venture is unavailing. Indeed, while the association may not conduct its business like a typical insurance company, it retains large degree of independence from the individual members. While Kappa and the other members of the Association pooled their resources and shared losses in order to maintain insurance at an affordable rate, this relationship does not rise to the level of a joint venture.

Furthermore, even if this court were to view the venture as narrowly as Interforce posits, the subject matter of the venture being the insurance provided, business realities of the worldwide shipping industry would be ignored. Indeed, a large percentage of the worldwide shipping market relies on P & I clubs such as L & L to provide insurance to its vessels.[40] Moreover, no court has held that membership in these associations constitutes a joint venture with the association itself such that a necessaries lien for insurance would be precluded. Holding so would defeat the purpose of the maritime lien by allowing ships to escape their insurance debts simply because the P & I clubs are structured differently than typical insurance companies. Moreover, given the percentage of the worldwide shipping industry that relies on this type of coverage, this court is not willing to dissuade these clubs from offering insurance by eliminating them as a lien holder because of their membership structure. Accordingly, for purposes of a maintaining its maritime lien, this court holds

---

**38.** *Haley v. C.I.R.,* 203 F.2d 815, 818 (5th Cir.1953).

**39.** *Id.* (quoting *Sasportes v. M/V SOL DE COPACABANA,* 581 F.2d 1204, 1208 (5th Cir. 1978)) (citations omitted).

**40.** Norman J. Ronneberg, Jr., *An Introduction to the Protection & Indemnity Clubs and the Marine Insurance They Provide,* 3 U.S.F Mar. L.J. 1 (1990/1991)(noting that P & I Clubs insure 90% of the world's merchant fleet).

that L & L was not involved in a joint venture with Kappa Shipping.

### 5. FD & D coverage is not a "necessary" under United States maritime law, therefore, no maritime lien exists for FD & D coverage.

 Next, Interforce argues that any calls for FD & D coverage are not necessaries and, therefore, do not give rise to a maritime lien for those amounts. Interforce points to the testimony of various witnesses who testified that FD & D coverage is purely optional, not all ship owners procured it, and that its main purpose is to cover an owner's legal fees and expenses arising from disputes between vessel owners and third parties in claims not covered by the P & I club. This court agrees that FD & D coverage is not a necessary under United States maritime law.

Section 31342 of the FMLA provides that "a person providing necessaries to a vessel...has a maritime lien on the vessel."[41] Section 31301 provides that " 'necessaries' includes [sic] repairs, supplies, towage, and the use of a dry dock or marine railway."[42] In *Equilease*, In holding that insurance was a "necessary", the Fifth Circuit defined "necessaries" as:

> most goods and services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged. These "things" may be money, labor, skills, and personal services as well as materials. It is the present, apparent want of the vessel, not the character of

the thing applied, which makes it a necessary.[43]

The parties have cited no case where a court has classified FD & D coverage as a "necessary" because none exist. Moreover, the absence of precedent signifies the weakness of L & L's position that a lien right exists for the unpaid FD & D calls, "since admiralty enjoys an unusually rich legal tradition and, more than any other contemporary area of federal law, relies on venerable precedents where they exist."[44]

However, in *Gulf Marine & Industrial Supplies, Inc. v. GOLDEN PRINCE M/V*, the Fifth Circuit examined whether legal fees were "necessaries" under United States maritime law. The lien claimant argued that legal fees were similar to the insurance coverage, as contemplated in *Equilease* and, as such, should be considered a "necessary." However, the court held that legal fees, unlike insurance, were beyond the scope of necessaries because they are not necessary for the ship to carry on its normal functions and not something essential to the vessel's operations.[45]

In the present case, the disputed claim for FD & D coverage, as coverage for legal fees and expenses, falls squarely between the insurance, as contemplated in *Equilease*, and legal fees. However, given the fact that FD & D coverage covers legal fees and because not all vessel owners opt for such coverage, *Gulf Marine* is on point; if legal fees are not "necessaries", then FD & D coverage, which covers legal fees, is also not a "necessary" as contemplated by *Equilease*. Indeed, given these facts, FD & D coverage, as opposed to Protection and Indemnity coverage, is not required

---

41. 46 U.S.C. § 31342

42. 46 U.S.C. § 31301

43. *Equilease*, 793 F.2d at 603.

44. 230 F.3d 178 (5th Cir.2000).

45. *Id.* at 180.

for normal operations, nor something needed to carry on its business. Therefore, no maritime necessaries lien exists for any unpaid FD & D calls.

### 6. English law applies to the 1994 and 1995 policy years and English law does not recognize a lien for Insurance premiums

Further, Interforce argues that the calls assessed for 1994 and 1995 policy years should not be included in any lien, because United States law was not applicable to those policy years. It claims that because the 1994 and 1995 L & L rules did not contain the "local law" language that was first adopted in 1996, English law, which does not recognize a lien for insurance premiums, applies. Therefore, all amounts included in the lien arising out the 1994 and 1995 policy years must be disallowed. However, since this matter was already decided by the United States Court of Appeals for the Fifth Circuit, the court is bound by that decision.

On August 2, 2001, Interforce filed a motion for reconsideration or certification of interlocutory order under 28 U.S.C. § 1292(b) urging this court to reconsider its ruling that United States law, and not English law, applied to the facts of the case. The Fifth Circuit heard the interlocutory appeal and ultimately affirmed this court's ruling that United States substantive law applies to this case.

 The "law of the case" doctrine, or "mandate rule", precludes this court from considering this argument. The law of the case doctrine is a self-imposed restriction by the courts developed in the interests of judicial economy to preclude

reexamination of issues decided on appeal.[46] The general rule is that a district court is bound by determinations of issues decided either expressly or by necessary implication on appeal.[47] Even if the appellate court did not explicitly discuss the issue, the district court is barred from reconsidering an issue that the appellate decree resolved, necessarily or implicitly, adversely to the party seeking reconsideration.[48] Indeed, with respect to rules of law, the law of the case doctrine applies even with respect to interlocutory appeals.[49]

On appeal, the Fifth Circuit held that the P & I rules call for the application of United States substantive law to determine the existence of maritime liens. In the opinion, the Fifth Circuit made no distinction between the rules for different policy years. This court is bound by the Fifth Circuit's determination of this issue and is barred from reconsidering an issue that the Fifth Circuit resolved.

 Moreover, even in the absence of the Fifth Circuit's ruling, this court determines that United States substantive law applies in this case. The 1994 and 1995 Rules each contain Rule 36 which states, in pertinent part, "[t]he Association shall have a lien on the ships of a member (including those of a co-assured) for any amounts owed to the Association by the member."[50] Also, Rule 44 of the 1994 and 1995 Rules provides that, "[t]hese rules and any special terms of entry form a contract of insurance between the Association and a member, and are subject to English law."[51] If the court were to determine that English substantive law ap-

**46.** *Conway v. Chemical Leaman Tank Lines, Inc.*, 644 F.2d 1059 (5th Cir.1981).

**47.** *Id.*

**48.** *Id.*

**49.** *See Royal Ins. Co. v. Quinn–L Capital Corp.*, 3 F.3d 877, 881 (5th Cir.1993).

**50.** L & L, Ex. 1(E) & (F).

**51.** L & L, Ex. 1(E) & (F).

plied to this case, as Rule 44 provides, then Rule 36 would be rendered meaningless because English law does not allow a maritime lien for amounts owed for insurance. Consequently, in order to give meaning to the entire contract, the court determines that when the Association is seeking a maritime lien for insurance premiums, Rule 36 is an exception to the choice of law provision contained in Rule 44. Such an interpretation is consistent with the holdings of other courts.[52] Therefore, United States substantive law, which recognizes a maritime lien for insurance premiums, applies to the P & I rules for all policy years in this case.

### 7. L & L commingled lien and non-lien items and Included non-lien items in its *in rem* claim, thereby precluding enforcement of any liens that may have existed.

Next, Interforce argues that L & L commingled lien and non-lien items and included non-lien items in its *in rem* claim. Interforce claims that L & L lumped fleet debts of Kappa Shipping into a single account, the installment plan lumped debts of all vessels into a single account, *in rem* claim lumped FD & D and 1994–1995 P & I calls into its entire *in rem* claim and that L & L improperly credited the amounts paid by Kappa to ships other than the M/V Abra (ex Kappa Unity). It claims that these actions preclude enforcement of any liens L & L may have against the M/V Abra (ex Kappa Unity). In its Post Trial Memorandum, Interforce cites *The Sophia Johnson*[53], a 1916 Western District of Washington case, for this proposition.

While L & L commingled lien and non-lien items, its maritime lien for necessaries is not precluded. The court in *The Sophia Johnson* held that:

> A party cannot intermingle items for which he has a lien with items for which he has no lien, and then assert a lien for the entire amount. Such is construed into a fraudulent intent and the entire claim is defeated.[54]

However, merely because one asserts a lien that ultimately fails based on an unsuccessful legal argument, does not mean the entire lien claim will be defeated. In the present case, L & L sought a lien on the M/V Abra (ex Kappa Unity) based on theories of breach of maritime contract and that the FD & D calls were necessaries. Moreover, the evidence shows that certain non-lien items were commingled with lien items in the various invoices and accounts. However, L & L only asserted a lien on those items for which it made a good faith legal argument. Accordingly, no fraudulent intent should be construed and L & L's claims for a breach of maritime contract lien and on FD & D calls as a necessaries lien, as commingled with lien items, does not preclude enforcement of L & L's necessaries lien.

In addition, the fact that L & L credited the accounts of other ships without crediting the M/V Abra's account does not preclude enforcement of the necessaries lien. Regardless of whether or not L & L created an after-the-fact accounting method to show that the various vessel accounts were credited by the date of the oldest debt, the lien is not waived. When a debtor makes a partial payment

---

**52.** *See North of England Protecting and Indemnity Association v. M/V NARA*, 2000 A.M.C. 681, 1999 WL 33116416 (E.D.La.1999)(holding that the general rule that English law applies does not apply in determining whether the claimant has a maritime lien); *West One Bank, Washington v. Continuity*, 1994 A.M.C.2059, 1994 WL

584723 (W.D.Wash.1994)(holding that there was no express intent that the choice of law rules applied to the existence of a lien).

**53.** 237 F. 406 (W.D.Wash.1916).

**54.** *Id.* at 408.

on a debt without identifying where the payment is to be allocated, barring fraud, the creditor is permitted to apply the funds in any manner it sees fit.[55] Furthermore, a maritime lien is not waived by arbitrary allocation of a partial payment among various debts owed to a lien holder.[56] Therefore, since the court finds that no fraud was involved in L & L's allocation of payments by Kappa Shipping to other vessels, L & L's necessaries lien is not waived.

**8. Unbudgeted supplementary calls and release calls are not properly assessed because Kappa Shipping was not bound to pay them or, alternatively, that the alleged debt for release calls did not arise until after Kappa Shipping alienated the vessel, at which time Kappa had no statutory authority to bind the vessel.**

▬ Furthermore, Interforce maintains that unbudgeted supplementary calls and release calls are not properly assessed because Kappa Shipping was not bound to pay them or, alternatively, that the alleged debt for release calls did not arise until after Kappa Shipping alienated the vessel, at which time Kappa had no statutory authority to bind the vessel. In a nutshell, Interforce first argues that any debt for unbudgeted supplementary calls not included in the installment plan are not properly assessed because Kappa did not agree to pay those calls. Next, Interforce argues that release calls are not properly assessed because the release calls were not assessed until after Kappa Shipping had divested itself of the M/V Abra (ex Kappa

Unity) and left the North of England P & I Association ("NEPIA"). Therefore, Interforce maintains that because Kappa no longer managed the vessel, as it was sold to Interforce, it had no authority to bind the vessel with any debt.

The evidence presented shows that while the installment plan did not include the unbudgeted supplementary calls, and that Kappa Shipping may not have agreed with the amounts of those calls, the evidence does not show that those calls were not owed, nor did it show that L & L waived its right to collect the calls. Indeed, the installment agreement stated that "[n]o unbudgeted supplementary calls to be taken into account *at this time.*[emphasis added]" [57] Moreover, George Andreadakis, Kappa Shipping's broker, stated in his testimony that, at the time of the installment plan agreement, Kappa Shipping did not accept the unbudgeted supplementary calls because "it was referred to all vessels together. It was...a huge confusion...." [58] Accordingly, while Kappa Shipping, at the time of installment agreement, may have disagreed with the amounts of the unbudgeted supplementary calls due to confusion from the fact that all of the vessels calls were lumped into one amount, there was no agreement or statement by either Kappa or L & L that those amounts would not be paid. Therefore, all unbudgeted supplementary calls for P & I insurance identified with the M/V Abra are properly assessed.

In addition, in its Post–Trial Memorandum Interforce makes much of the fact that Kappa was induced to join NEPIA under the promise of its not being bound for supplemental calls.[59] It asserts that

55. *Compagnia Maritima La Empresa, S.A. v. Pickard,* 320 F.2d 829, 833 (5th Cir.1963).

56. *Christiana Marine Service Corp. v. THE HERCULES,* 1990 WL 145556, *5 (E.D.Pa. 1990).

57. Ex. Abra 9.

58. Andreadakis testimony transcript, p. 16–17.

59. Interforce Post–Trial Memorandum, p. 21.

once Kappa joined NEPIA, no release calls could be assessed. However, L & L adds that while this was true, an additional proviso was added. L & L claims that a member leaving L & L to join NEPIA would not be assessed release calls, however, if the member then left NEPIA, the member would then be liable for future supplementary calls, specifically, previously waived release calls, from open policy years. Furthermore, Mr. Andreadakis' testimony supports L & L's version of the conditional non-assessment of release calls. Mr. Andreadakis testified that he understood that even though L & L promised not to assess release calls if a member switched to NEPIA, that member would still be responsible for supplementary calls owed to L & L, specifically the conditionally waived release calls.[60] Therefore, the release calls were properly assessed when Kappa left NEPIA.

■■■ Additionally, while the release calls may not have been assessed when the M/V Abra (ex Kappa Unity) was under the control of Kappa Shipping, the insurance for which the release calls were assessed was provided when Kappa Shipping controlled the vessel. However, it is immaterial when the calls were assessed; What matters is that when the insurance or "necessary" was provided, Kappa Shipping was able to bind the M/V Abra (ex Kappa Unity). At that time, Kappa was able to bind the M/V Abra (ex Kappa Unity). Therefore, all release calls properly identified with the M/V Abra (ex Kappa Unity) for P & I insurance are properly assessed.

### 9. The doctrine of laches should bar enforcement of any lien rights that might be found to exist.

■■■ In addition, Interforce asserts that the doctrine of laches should bar enforcement of any lien rights against the M/V Abra (ex Kappa Unity). Interforce claims that L & L's decision to extend substantial credit, allow significant arrearages to accrue, and defer supplemental and release calls, should operate to its detriment and not to the detriment of Interforce, a bona fide third party purchaser. However, this court disagrees and finds that the doctrine of laches does not apply in the present case.

■■■ The doctrine of laches is an affirmative defense barring assertion of a lien when an unreasonable delay occurred in asserting the lien and prejudice resulted from that delay.[61] "The existence of laches is a question of fact to be decided by the court after weighing the equities as they appear from the facts of each case."[62] The Fifth Circuit uses a three-part test to analyze the validity of a laches defense: 1) whether there was delay in asserting a right or claim; 2) whether or not the delay was excusable; and 3) whether the delay resulted in undue prejudice to the party against whom the claim is asserted.[63] Moreover, in cases where the vessel has been sold to a bona fide purchaser, the holder of the unrecorded lien must exert a "high degree of diligence" to preserve the lien.[64]

---

**60.** Andreadakis testimony transcript, p. 53–54.

**61.** See Esso Int'l. Inc. v. SS CAPTAIN JOHN, 443 F.2d 1144, 1150 (5th Cir.1971).

**62.** Id.

**63.** See West Wind Africa Line, Ltd. v. Corpus Christi Marine Services, Co., 834 F.2d 1232, 1234 (5th Cir.1988) (citing Mecom v. Levingston Shipbuilding Co., 622 F.2d 1209 (5th Cir.1980)).

**64.** Tagaropulos, S.A. v. S.S. Santa Paula S.S. Hans Isbrandtsen, 502 F.2d 1171, 1172 (9th Cir.1974).

The installment agreement between L & L and Kappa Shipping was entered into in June of 1999, Kappa's last payment was made in June 2000, and L & L issued a notice of termination of coverage to Kappa in July of 2000. This suit was instituted in February of 2001.

Since L & L and Kappa Shipping acted properly when the installment agreement was entered into, any examination of unreasonable delay must commence when Kappa Shipping stopped making payments. As analyzed above, the installment agreement was entered into in an effort to preserve L & L's customer base. Nothing in the law of maritime liens requires a creditor to immediately commence seizure proceedings, nor are creditors prohibited from entering into payment schedules.[65] Consequently, the period for determining any unreasonable delay must commence when Kappa stopped making payments—July 2000. The evidence demonstrates that L & L diligently pursued the M/V Abra (ex Kappa Unity) to recover the outstanding debts beginning in August of 2000. In addition, the evidence shows that L & L diligently searched various ports in an effort to seize the M/V Abra prior to its ultimate seizure in February 2001. Therefore, while a delay of approximately nine months may have occurred prior to institution of the suit, the delay is excusable given the diligence of L & L's search. Furthermore, Interforce put forth no evidence that any prejudice resulted from the delay that occurred while L & L searched for the M/V Abra. Therefore, the defense of laches must fail.

### 10. L & L cannot have a maritime lien for any portions of its claim reflecting assessments of contractual Interest because contractual Interest is not a part of a maritime lien

Interforce argues that if interest is assessed at all on any portion of its lien claim, only the statutory rate may be imposed, not the contractual rate. Liverpool and London Rule 32(C) provides for interest to accrue on a member's debt at LIBOR plus 5%. Interforce asserts that this provision is inapplicable in the present case and that any interest imposed should be done so at the lower statutory rate. This court agrees.

▮▮▮▮ The general rule is that, in admiralty cases, prejudgment interest should be awarded, unless exceptional circumstance exist.[66] However, the contractual rate of interest is inapplicable when lien claimants are recovering on an *in rem* claim rather than an *in personam* claim.[67] In this case, Liverpool and London is attempting to recover the debt based on an *in rem* necessaries lien claim for insurance. Therefore, in the present case, any prejudgment interest is awarded at the lower statutory rate.

### 11. Damages should be awarded to Interforce on its counterclaim.

Finally, Interforce argues that it should be awarded damages due to Liverpool and London's bad faith assertion of a unjustified maritime lien. Since this court finds that Liverpool and London was in good

---

**65.** *See Crustacean Transp. Corp. v. Atalanta Trading Corp.*, 369 F.2d 656, 660 (5th Cir. 1966).

**66.** *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995).

**67.** *See Inland Credit Corp. v. M/T Bow Egret*, 552 F.2d 1148, 1155 n. 9 (5th Cir.1977)(holding that the lien claimant was only entitled to recover interest based on the lower statutory rate).

faith when it asserted the lien, damages are not awarded in favor of Interforce.

## C. Conclusion

For the above reasons, it is hereby determined by the court that Liverpool & London is entitled to a maritime necessaries lien for unpaid calls due for insurance, excluding those due for FD & D coverage. Moreover, Liverpool and London is entitled to prejudgment interest due at the legal rate. Judgment for the Liverpool and London and against the M/V Abra (ex Kappa Unity) and Interforce Shipping Company, as claimant, will be entered accordingly. Counsel for Liverpool & London is directed to submit a proposed form of judgment after having obtained approval as to form from opposing counsel.